**A. C. BALL COMPANY**

v.

**The UNITED STATES.**

No. 588–71.

United States Court of Claims.

March 17, 1976.

Travis M. Jackson, San Carlos, Cal., atty. of record for plaintiff.  Truce, Veal & Jackson, San Carlos, Cal., of counsel.

Robert N. Ford, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant. Robert E. Tressel, Washington, D. C., of counsel.

Before SKELTON, NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's and defendant's exceptions to findings of fact and recommended decision submitted on January 14, 1975, by Trial Judge David Schwartz, in accordance with Rule 134(h). He redetermined *de novo* after trial the alleged excessive profits received or accrued by plaintiff in its fiscal year 1967 on defense contracts and subcontracts, under 50 U.S.C. App. §§ 1212 et seq., 1218, as amended, fixing the amount of said excessive profits at $50,852 out of total renegotiable profits of $478,297.

■ The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Upon consideration thereof, since the court agrees with the said recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case.

The Government argued before us that the trial judge exempted half of plaintiff's profits, without authority in any statutory exemption. We find this argument little more than rhetoric. There is a wide difference between exempting a contractor from renegotiation and renegotiating him but determining he realized no excessive profits. The Government urged below, as it did here, that plaintiff's profits resulted from absence of competition due to wartime demand. The trial judge felt unable wholly to reject or wholly to accept this view. For lack of any better way, he decided on what he called a "jury verdict" applying it to half only of plaintiff's profits. Applying all the statutory factors to all of plaintiff's renegotiable business, but postulating competition as to one-half and absence of competition as to the other half, the trial judge determined no excessive profits as to the former, and $50,852 excessive profits as to the latter. We see no legal error in this. It is the kind of broad-brush technique the Renegotiation Act frequently demands.

■ Perhaps the words "jury verdict" are overused in our decisions, and such words could not legitimize an otherwise illegitimate technique, but any trier of fact, jury or judge, at times encounters situations where he must either abnegate his function, or make broad estimates on the basis of data of the most indefinite kind. *See, e. g., Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 1227, 186 Ct.Cl. 1, 24 (1968), and the problem is pointed up in Judge Collins' dissent 405 F.2d at 1231, 186 Ct.Cl. at 31.

A jury returning a general verdict cannot explain or justify the reasoning it has used, or state the subsidiary facts it has found. A reviewing appellate court must speculate as to these matters. One of our trial judges can and usually does explain just why and how he reached a decision, even when he employs, as here, a quotient or averaging technique, or strikes a level between the contentions of the parties, neither accepting nor rejecting fully the position of any party or witness. Therefore, in a case such as this, "jury verdict" may be hardly the *mot juste*.

■ The trial judge took proper notice under the statutory "risk" factor of the contractor's severe loss in 1969, though the nature of its business remained the same except for larger volume. He cites in fn. 5, a Renegotiation Board regulation calling for "special consideration" to be given such cases. He might also have mentioned that in 1971, in reporting Pub.L. 92–41, which transferred redetermination jurisdiction from the Tax Court to this court, the Senate Finance Committee referred to the inequitable results sometimes resulting from a tunnel-visioned use of the fiscal year method of renegotiation, and commended a

variety of methods the Board used to alleviate these effects. One was:

\* \* \* \* \* \*

5. The Board gives consideration to evidence showing risks through actual realization of losses incurred by the contractor in performing contracts in other years similar to the contracts undergoing renegotiation. \* \* \*

The Committee further agreed that—

\* \* \* the Renegotiation Board (and the Court of Claims in redetermination cases) should give *greater emphasis* to the applicability of these various forms of relief. \* \* \* (Emphasis supplied).

Senate Report No. 92–245, June 29th, 1971, 1 U.S.Code Cong. & Admin.News (1971) pp. 1130, 1133. The similar House Report is not there reprinted. It would seem the Congress was dissatisfied with the degree of emphasis that had been accorded hitherto, despite the regulation, and the Renegotiation Board had closed this case before 1971, in 1969. *See*, also Nichols, *Equalizing Profit And Loss In Renegotiation*, 45 Va.L.Rev. 41 (1959). The trial judge accorded plaintiff "highly favorable consideration under the risk factor", and under the circumstances, nothing less would have been sufficient.

Accordingly, the court determines as a matter of law that plaintiff realized excessive profits in the gross amount of $50,852 from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended, and it is Ordered that judgment be and the same is entered for the United States on its counterclaim in the said sum of Fifty thousand eight hundred and fifty-two dollars ($50,852), less appropriate state and federal tax credits, plus appropriate interest thereon.

Trial Judge Schwartz's opinion, which is adopted by the court, follows. His findings of fact and conclusion of law are omitted, but have been furnished to the parties, and are approved. The facts appear in the opinion so far as relevant to our review.

1. Section 103(e) (50 U.S.C. § 1213(e) (1970)) of the Act provides as follows:

   "*Excessive profits.*

## OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge: Plaintiff, dissatisfied with a unilateral determination of the Renegotiation Board under the Renegotiation Act of 1951, as amended, that in plaintiff's fiscal year 1967 it realized excessive profits in the amount of $250,000 on renegotiable sales of $2,582,942, has instituted this proceeding for a de novo judicial redetermination of its excessive profits under section 108 of the Act. 65 Stat. 7 (1951), as amended, 50 U.S.C. App. §§ 1212 *et seq.*, § 1218 (1970), as amended. The action was first brought in the United States Tax Court and removed to this court following the transfer here of jurisdiction over such actions, provided in Public Law 92–41, effective July 1, 1971. Section 2(b), 3(a), 85 Stat. 97, 98 (1971), 50 U.S.C. App. § 1218 (1972).

A preliminary controversy relates to the amount of profits earned by plaintiff in the year under review. Defendant seeks to add to profits as shown by plaintiff's books the amount by which the year-end inventory of work in process is alleged to have been overvalued, and also an amount by which compensation paid to stockholder-executives is said to have been unreasonable and excessive. The contention as to inventory is here rejected and the contention as to executive compensation is here upheld, to the extent of $59,324. The addition of this sum of $59,324 to plaintiff's profits gives total profits of $481,281 for 1967, to be considered for excessiveness.

Section 103(e) of the Renegotiation Act prescribes seven "factors" to be considered in the determination of excessive profits. The primary factor is the efficiency of the contractor; for it, "favorable recognition must be given" the contractor. The other factors, to be "taken into consideration," are the character of the business and its risks, its contribution to the war effort, the net worth and the reasonableness of the costs and profits of the contractor, and, finally, the public interest and principles of fair dealing. 50 U.S.C. App. § 1213(e) (1970).[1]

The term 'excessive profits' means the portion of the profits derived from contracts with the Departments and subcontracts which is de-

Reasonable, non-excessive profits under the Act are to be determined by overall evaluation of the particular factors present. 32 CFR § 1460.8(a) (1974). There is no more precise formula for the determination of excessiveness under section 108 of the Act.

On consideration of all the factors, plaintiff's profits in its tax year 1967 are determined to have been excessive in the amount of $50,852. Detailed findings of the facts relevant to the several statutory factors accompany this opinion. Each factor will be separately discussed; the controverted aspects of plaintiff's profits will be postponed to follow the discussion of some of the factors.

### Character of Plaintiff's Business

The factor most usefully first discussed is the character of plaintiff's business (section 103(e), note 1, *supra*):

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

Plaintiff is a California corporation which in its fiscal year 1967 was engaged almost exclusively in the performance of Government military supply contracts, all renegotiable. The work for non-Government customers was less than 1 percent of the total. Plaintiff was awarded 130 contracts during the year and made shipments under 142. Total sales were $2,599,060 of which 99.38 percent of $2,582,942 were renegotiable sales. Profits were $481,281, of which prof-

its attributable to renegotiable sales were $478,297, or, expressing profit as a percentage of sales, 18.5 percent.

Plaintiff made a great variety of parts and devices of all sizes and shapes such as wheels, screws, fittings, couplings, components of other devices, valve replacement "mechanisms," screens, and various kinds of assemblies. Customers were Air Force bases, arsenals and defense and military agency construction supply and general supply centers. Quantities usually were small, ranging from one to 1,000 with one exception. One of plaintiff's jobs, the construction of wheel assemblies for a type of landing tank used by the Marine Corps, was far larger than any others, accounting for approximately $900,000 in sales, or almost 35 percent of the total.

Plaintiff was never a "sole source" supplier and its products were never "off the shelf." All the products were made from Government drawings accompanying solicitations circulated by the Government as Invitations for Bids, Requests for Bids and Requests for Quotes.

All of plaintiff's contracts were awarded following competitive bidding, and substantially all of the work was done under firm, fixed-price Government contracts. Over 90 percent' of the contracts contained the Government standard conditions for supply contracts.

Manufacture usually required a succession of steps and processes—casting, boring, plating, painting and so on, and one or more subassemblies, before final assembly, pack-

termined in accordance with this title to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity, and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted."

aging and shipping. While the techniques required for these processes were usually not complex, some of the items were complex and some of the drawings contained errors and ambiguities. Manufacture particularly presented special problems when plaintiff was making the item for the first time, as often happened.

The production system utilized by plaintiff was highly complex. After bidding and obtaining the contract, plaintiff subcontracted for most of the production steps, such as forging and casting, the finished parts being returned to plaintiff's premises for final assembly and packaging. Plaintiff also did testing, some painting, and shipping. Bidding, the procurement and supervision of subcontractors, and assembly were plaintiff's main functions.

The business was founded and operated by a husband and wife, Mr. Alfred C. Ball and Mrs. May F. Ball. Working together with great industry and with some small earlier experience in a similar business, Mr. and Mrs. Ball started the present business in 1965 as an offshoot of their business as distributors of ball bearings. They had no employees other than themselves. In that year their sales were $105,000, with profits of about $14,000. Mr. Ball would bid on a small Government contract, say for a few fittings for a navy yard or an arsenal, and if he got the award he would go out and arrange for the work to be done. Mrs. Ball handled the office and all the paper work. As more contracts were obtained, the business prospered and three or four helpers were hired.

In the first half of 1966, sales amounted to almost $300,000, an average monthly rate of $50,000. In the next 2 months, before the beginning, on September 1, 1966, of the fiscal year under review, sales averaged $75,000 monthly. In the next year, the review year, total sales were, as noted, $2,599,060, a monthly rate of over $210,000. Plaintiff's books showed direct costs of $1,828,805, overhead of $348,298, and profits of $421,957. (As adjusted in consequence of decisions in this opinion, overhead was $288,974 and profits $481,281.)

When the business was incorporated in June 1966, the Balls had 10 employees. Mr. and Mrs. Ball were now, respectively, the president and the secretary of the company as well as joint owners of its stock. They started the review year, 2 months later, with 19 employees, increased to 35 by the end of the year. The company operated in 12,000 sq. ft. of space, in a building owned by the Balls; during the year a mezzanine was added, at economical cost.

Mr. Ball continued to do all the bidding, acted as design engineer and with the general manager, a Mr. William W. King, supervised all operations. Mr. King joined the company in 1966 as foreman, with little experience; he was trained by Mr. Ball. When the business was incorporated, he became vice-president.

The key to the success of the business was the abilities and energies of the three principals, particularly Mr. Ball's expertise and industry in bidding.

Mr. Ball, in earlier life a machinist and shop foreman, was a man of extraordinary abilities. He would file large numbers of bids daily, without obtaining quotations from possible subcontractors. Relying on his great expertise as to castings, borings and other processes, and their costs, and on a file of drawings which he kept, he would fill out and submit from 10 to 30 bids per day, approximately 6,000 in the year. He was low bidder in approximately 3 percent of his bids, and received awards in 1.5 percent.

After a bid was filed, Mr. Ball handled the pre-award surveys and, if plaintiff got the award, it sought out subcontractors, negotiated prices and placed orders with them, monitored and expedited their work and assisted them as necessary. The staff included a quality control manager, a manufacturing manager, two project engineers and several inspectors. The balance of the staff was employed in the production department.

Mrs. Ball handled financial affairs, office and paper work. She was in charge of payroll, billing, receipts and payments to

subcontractors. She took care of insurance coverage, progress payment requests and presentations to the Small Business Administration for certificates of competency. She negotiated settlements on terminations for convenience and established a materials control system. When necessary to meet a deadline, she helped out in the production department.

All three worked long hours, sometimes as much as 90 hours a week.

As might be expected in a business relying so heavily on subcontracting, capital and net worth were small in comparison to sales and profits. Opening net worth was $69,571, and opening capital was $212,793. Plaintiff invested additional capital during 1967 to the extent of only $57,385.

### Efficiency

Section 103(e) (note 1, *supra*) directs that the efficiency of the contractor is to be considered,

> with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower;

In amplification of the statutory language, the regulations of the Renegotiation Board refer to the meeting of production schedules, expansion and maximum use of facilities, rejection record, reported difficulties with the product, cost comparisons with other fiscal years and other contractors, decreases in controllable expenses and costs of materials, subcontracted items, number of employees in relation to production and reduction of waste. Regulations, Renegotiation Board, 32 CFR § 1460.9(b) (1974). Plaintiff did very well in almost all these areas.

*Quality.* Quality was very good. None of the goods shipped in the review year was rejected by Government field operations personnel. Only four first-articles submitted by plaintiff were rejected. A Government memorandum in evidence stated that plaintiff was cooperative, complied with requests and accepted suggestions of the Government's quality assurance representatives, overpacked rather than under-packed, and tried to maintain the highest qualify standards. Defendant admits there were no problems with the quality of plaintiff's products.

*Quantity.* Volume was eminently satisfactory; plaintiff expanded its production from $105,000 in 1965 to an annual rate of $585,000 in the first half of 1966, to $2,600,000 in the review year, fiscal 1967.

*Economy.* Plaintiff was efficient in the use of space. It carried out its expanded production in 12,000 sq. ft. of space, enlarged during the year, economically, by the addition of a mezzanine. The roadwheel contract, utilizing 30 subcontractors and performed with praise from the Marine Corps, was distinguished by a highly efficient in-house final assembly line designed by plaintiff. Production was increased from a beginning of 10 to 80 per day. The work was done under two contracts. The first contract was bid at $577.50 per unit. On the second contract, plaintiff lowered its bid to $357, a distinct sign of economy with the benefits being passed on to the Government. Plaintiff was the low bidder in both contracts. One of the other bidders had previously manufactured the wheel and had in its possession the necessary tooling. The contracts were completed substantially on schedule.

Little scrap was produced in plaintiff's operations. When scrap appeared, occasionally, as a result of subcontracted work, plaintiff would rework it for use elsewhere.

Plaintiff was efficient, also, in the matter of personnel costs. The number of employees—an average of 27 during the year—was small in the light of the volume produced. Mr. Ball did all the bidding, supervised production and acted as design engineer (a design engineer was hired, in the following year, to relieve him). Mrs. Ball did all the financial work, was in charge of the office, and was not above packaging and working on the assembly line or driving a forklift when need arose.

Mr. Ball's ability to bid without obtaining quotations, one of plaintiff's greatest assets, was a distinct economy. Less experi-

enced bidders, who obtained quotes before bidding, required numbers of assistants in the bidding department.

Plaintiff worked with great industry in small, efficiently managed quarters, with minimum overhead and a minimum staff, to produce a very substantial, increasing volume of good quality goods, thereby displaying a high degree of efficiency of the kind contemplated by the Act,[2] for which plaintiff is entitled to much favorable consideration.

### Subcontractor Utilization

The most prominent characteristic of plaintiff's method of doing business was the high degree of its utilization of subcontractors. This aspect of plaintiff's business, bearing on the factors of efficiency and character of business (and as will appear on other factors as well) warrants separate discussion.

After an award was received, plaintiff would as a matter of policy solicit quotations from at least three vendors for each subcontract. Before choosing a vendor with whom they had not dealt before, Mr. Ball or Mr. King would visit the shop to judge capability and facilities and pass on quoted prices and promised delivery. When quoted costs seemed too large or were greater than expected, plaintiff would solicit still further bids or suggest alternative, cheaper methods of production. Back-up vendors were usually maintained in case of a subcontractor's failure to perform.

Plaintiff used subcontractors throughout the United States. Most were small businesses; firms with less than 150 employees got $1.6 million or 80 percent of plaintiff's total purchases of $2 million.

The subcontractors were provided with active assistance in matters of material sources, in expediting promised deliveries and in engineering; assistance was given both at the subcontractor's plant and plaintiff's own plant. In some cases plaintiff supplied materials, in others it helped the subcontractor to develop its own sources. When it would appear that the costs of the work subcontracted were rising beyond expectation, plaintiff would suggest to a subcontractor alternate, more economical means of production.

Monitoring was closely done, by regular telephone calls and by visits to plants when it seemed necessary. During the year plaintiff bought an airplane with which to visit and inspect subcontractors. Records were kept on subcontractors' adherence to delivery schedules and quality control standards. When a subcontractor was short of money, plaintiff paid it promptly after work was done.

Despite plaintiff's excellent efforts in monitoring its subcontractors, it was plagued by delinquencies caused by the failure of subcontractors to make scheduled deliveries. Such delinquencies were a constant problem during the year, although they were reduced towards the end of the period. At one time plaintiff was, because of its late deliveries, on a list of "top problem contractors" kept by an Air Force office, but it was not on a second list of delinquencies on important contracts. Of the 181 contracts worked on, delivered or awarded in 1967, 113 or 62 percent were not completed by the original contract due date. Extensions were obtained in most of these, but plaintiff was late and required to pay a penalty in 38 cases or in 21 percent of the 181 contracts. The total of the penalties paid was $9,390.

Failures of subcontractors to make deliveries were during this period common and chronic. The flood of Government orders, many of them with priority over others, was doubtless the cause of many unfulfilled

---

2. The regulations of the Renegotiation Board provide that (32 CFR § 1460.8(a) (1974)):

"Contractors who sell at lower prices and produce at lower costs through good management, including conservation of manpower, facilities and materials, improved methods of production, close control of expenditures, and careful purchasing will receive a more favorable determination than those who do not. Such favorable or unfavorable determination will be reflected in the profits allowed to be retained by the contractor or subcontractor as nonexcessive."

promises. In one case, Kaiser Aluminum, one of plaintiff's subcontractors, wrote to plaintiff concerning its lateness: "This is not unusual, as most of our orders are required before we can ship same."

There was no showing that the contracts on which plaintiff was late had high priority among other war contracts; there was no showing that other, similar contractors had better records in meeting delivery schedules. One of plaintiff's competitors was delinquent in 25 percent of its deliveries; in another 50 percent it had received extensions of time, and made delivery in the time as extended. That record is substantially similar to plaintiff's record.

In 1967 a contractor for small quantities of metal parts and pieces who delivered to military supply agencies good quality goods on extended delivery dates was probably doing as good a job as was possible. The modest number and dollar amount of the penalties assessed against plaintiff suggests that its delinquencies were not regarded as serious.

When delivery dates could not be controlled, plaintiff made extra in-house efforts on assembly line design. An incentive award program for its own employees, instituted during the year, was in part designed to compensate for late deliveries by subcontractors, by encouraging improvement in assembly and in-house processing time.

Plaintiff performed well, overall, in choosing and monitoring subcontractors. In the early portion of the year, its delivery record was less good, but energetic efforts apparently made improvement. Such delinquencies as took place, moreover, appear to have occurred despite constant efforts by plaintiff to choose, monitor and expedite subcontractors. Delinquencies were not shown to have been within the control of plaintiff, although plaintiff was of course contractually responsible for its late deliveries.

On the record overall, and especially considering the volume and quality produced, plaintiff is entitled to favorable consideration for its efficiency in effective utilization and monitoring a large network of subcontractors and in improving its performance in this regard during the year under review. The system of subcontracting enabled it to enlist and consolidate the efforts of specialists almost without regard to their location, whose gathering together under one roof would have required a heavily capitalized large enterprise. As a small prime contractor plaintiff by extensive subcontracting was able, without capital investment, to compete effectively against much larger, capital- and labor-intensive businesses with large overheads, and thereby successfully and profitably to perform contracts for a wide range of products.

The standard conditions in plaintiff's contracts with the Government called on plaintiff to "accomplish the maximum amount of subcontracting to small business concerns that the Contractor finds to be consistent with the efficient performance of this contract." The Renegotiation Board's regulations provide that "Defense production needs and the policy of Congress require that subcontracting, particularly to small business concerns, be used to the maximum extent practicable." Extensive such subcontracting receives favorable consideration. 32 CFR § 1460.14(b)(3)(i).[3]

---

**3.** 32 CFR § 1460.14(b)(3) (1974) provides as follows:

"(3)(i) Defense production needs and the policy of Congress require that subcontracting, particularly to small business concerns, be used to the maximum extent practicable. Although a contractor who subcontracts work may not reasonably expect to be allowed as large a profit thereon as if it had done the work itself, subcontracting of the kind described in this subparagraph, especially the extent to which subcontracts are placed with small business

concerns, will be given favorable consideration in the renegotiation of the contractor.

(ii) A contractor will be given favorable treatment when, by subcontracting, it utilizes in the defense effort facilities and services, particularly of small business concerns, which might otherwise have been overlooked or passed by; when it has demonstrated its efficiency and ingenuity in finding appropriate opportunities for subcontracting; when the amount of subcontracting so accomplished is substantial; when the amount or complexity of technical, engineering and other assistance ren-

Plaintiff is entitled to favorable consideration for its effective carrying out of the national policy of encouragement of subcontracting to small business, particularly in defense production. By marshalling the services of small business subcontractors over the whole country, plaintiff both contributed to the welfare of small business and brought resources into defense and war production "which might otherwise have been overlooked or passed by." 32 CFR 1460.14(b)(3)(ii), note 3, *supra.*

### Amount of Profit: Reasonable Executive Compensation

One of the issues bearing on the amount of plaintiff's profits in 1967 to be examined for excessiveness is whether the compensation paid to the stockholder-principals, Mr. and Mrs. Ball, was excessive. To the extent the answer is in the affirmative, overhead was overstated and profit understated.

During 1967, the plaintiff paid Mr. Ball a total of $118,571 as compensation, Mrs. Ball $40,753 and Mr. King $53,499. In each case compensation was made up of salary, payments from a "Cost Savings Fund" and "incentive awards." The Cost Savings Fund was created by the board of the plaintiff corporation to reward officers for their efficiency in reducing overhead, presumably controllable by the officers. The payments denominated "incentive awards" were voted by the board to all employees to promote morale and reward efficient performance.

The Fund and the system of awards are somewhat inconclusively criticized by the Government for their theory, basis and administration. There is no proof that either Fund or award system was fraudulent or a sham. Since, however, all the payments were in the last analysis made by Mr. and Mrs. Ball, the two owners of the company, to themselves, an issue remains as to whether the total was excessive or unreasonable as compensation—whether any part is to be regarded as a dividend or distribution of profit.

The Renegotiation Act provides that the cost to be deducted from gross renegotiable receipts to arrive at profits are those "estimated to be allowed" as deductions and exclusions under the Internal Revenue Code. § 103(f), 50 U.S.C. App. § 1213(f). The rule of decision for the issue of reasonable compensation is therefore the same as in tax cases under Internal Revenue Code, § 162(a)(1), namely, that "reasonable and true compensation," to be determined on all the facts, no one of which is controlling, is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. I.R.C.1954, § 162(a)(1), Treas.Reg. § 1.162–7(b)(3), 1958–1 Cum.Bull. 63–70; *Giles Industries, Inc. v. United States,* 496 F.2d 556, 204 Ct.Cl. 202 (1974); *Charles McCandless Tile Service v. United States,* 422 F.2d 1336, 191 Ct.Cl. 108 (1970); *Griffin & Co. v. United States,* 389 F.2d 802, 182 Ct.Cl. 436 (1968).

The Government relies on the treatment by the Internal Revenue Service of the income tax return of plaintiff for 1967. On the audit by the Service, $107,324 of the total compensation paid to Mr. and Mrs. Ball was disallowed, adjustment was made and a deficiency letter went out to plaintiff. The record is silent as to any contest and it is to be presumed that the deficiency was paid. The deficiency letter stated that reasonable compensation for Mr. Ball was $40,000, and for Mrs. Ball $12,000, a total of $52,000 or $107,324 less than the sum actually paid. Because, urges the Government, the determinations of the Commissioner are presumptively correct, plaintiff has the burden of proving otherwise than that reasonable compensation for the two was $52,000.

dered by the contractor to the subcontractor is substantial; and when the price negotiated with the subcontractor is reasonable in view of the character of the components produced.

(iii) The portion of the renegotiable business of the contractor which is subcontracted will be a part of its total sales, and separate consid-

eration must be given in applying to this portion the factors of risks assumed, capital employed, and reasonableness of costs and profits.

(iv) The subcontractor, of course, will receive favorable consideration in renegotiation for the successful employment of its own facilities and production skill."

■ The "presumption" in favor of the determinations of the Commissioner of Internal Revenue, frequently referred to in tax refund cases, is an expression of the character of the suit as one for money had and received, in which the plaintiff must establish by a preponderance of the evidence that he has overpaid his taxes and is entitled to a money judgment. *Missouri Pacific RR v. United States*, 338 F.2d 668, 168 Ct.Cl. 86 (1964); *Eli Lilly & Co. v. United States*, 372 F.2d 990, 997, 178 Ct.Cl. 666, 677 (1967). The presumption is thus not transferable, as a rule of evidence might be, to suits of a different character, especially to a renegotiation case, where the hearing is de novo and the burden of proof is on the defendant, the Government. *Lykes Bros. SS v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972).

The regulations of the Renegotiation Board provide that the Board will exercise a judgment independent of the action of revenue agents as to what items are allowable as deductions or exclusions under the Internal Revenue Code. 32 CFR § 1459.-1(b)(4) (1974). The Renegotiation Act of 1943 provided for the deduction from gross profit of deductions estimated to be "allowable"; the present Act substituted "allowed" for "allowable." Section 403(a)(4)(B), Act of 1943, 58 Stat. 78, 79, 50 U.S.C. App. § 1191(a)(4)(B) (1970); § 103, Act of 1951, 50 U.S.C. App. § 1213(f). Yet the Tax Court in construing the 1943 Act did not feel itself bound by a determination by the Commissioner of Internal Revenue. *Marie & Alex Manoogian Fund v. Renegotiation Board*, 24 T.C. 412, 415 (1955), *app. dismissed*, 232 F.2d 758 (C.A.6), *cert. denied*, 352 U.S. 929, 77 S.Ct. 228, 1 L.Ed.2d 164 (1956); *Puget Sound Machinery Depot v. Land et al.*, 17 P–H Tax Ct.Mem. 617, 630, 4 CCF ¶ 60,535, at p. 50,927 (1948); *Eastern Machinery Co. v. Under Secretary of War*, 12 T.C. 71, 74 (1949), *aff'd*. 86 U.S.App.D.C. 331, 182 F.2d 99 (D.C.C.A.1950) (1943 Act). The burden of proving the Commissioner's conclusions to be correct is, therefore, on the Government, with the burden as to the entire case.

■■ Plaintiff has, however, the burden of going forward as to the accuracy of the financial data going to the amount of his profits. *Lykes Bros. SS v. United States, supra*, 459 F.2d at 1401, 198 Ct.Cl. at 326. Final persuasion on the reasonableness of compensation is necessarily influenced, also, by the circumstance of the large proportion of claimed overhead—$159,324 of $348,298 —paid to the two executives who were the sole stockholders. No disinterested or economy-minded stockholders here stood ready to scrutinize officer compensation. In consequence, the payments to sole stockholder-executives are "subject to close scrutiny" in order to insure that salaries and bonuses are not being used as a vehicle for siphoning off otherwise taxable, or renegotiable, profits. *Boyd Constr. Co. v. United States*, 339 F.2d 620, 624, 168 Ct.Cl. 579, 586 (1964); *Bringwald, Inc. v. United States*, 334 F.2d 639, 167 Ct.Cl. 341 (1964); 4A Mertens, Law of Federal Income Taxation (Rev.1972) § 25.81.

The evidence includes these data: (1) an audit for a part of the year under review by an auditor with the Defense Contract Audit Agency which, converted to a whole year, gives a total reasonable annual compensation for the year for Mr. and Mrs. Ball of $52,000; (2) the Commissioner's determination and the results of the I.R.S. audit, to the same effect as the DCAA audit; (3) that an average of $32,000, with a range of $22,000 to $42,000, was in 1967 paid to executives as compensation by companies in the "fabricated metal products industry" with sales in the $2.5 million range; (4) that in 1967 executive compensation in the metal fabrication industry by companies with $1–5 million in assets was 2.6 percent of total sales, whereas plaintiff's officers were paid $212,823 or 8.2 percent of total sales of $2,599,060; (5) testimony of two witnesses from the industry; one testified to Mr. Ball's merits and estimated his worth at $100,000 a year and the other testified that principals in a somewhat comparable business were, with the approval of the I.R.S., paid a total of $81,250 each in salary and I.R.S.-approved pension and profit sharing plans.

I give relatively little weight to the audits—both reaching the same result—by the DCAA and the I.R.S. The I.R.S. auditor did not testify, and the plaintiff's failure to challenge the Commissioner's determination and the payment of the deficiency of $101,-808 is not, realistically, an admission of very great materiality, for it may have been motivated by other considerations than a recognition of the accuracy of the determination. *Cf. Eastern Machinery Co. v. Under Secretary of War, supra,* 12 T.C. at 74. The DCAA auditor, who did testify, seemed to me to have colored his conclusions by some assumptions as to the non-competitive conditions in plaintiff's industry and by an insufficient consideration of the long hours worked by Mr. and Mrs. Ball.

The statistics in the record on salaries paid executives in comparable industry have only limited applicability. Mr. Ball was a very special executive, and cannot be compared to the ordinary, more or less fungible executive.

Mr. Ball was the brain and driving force of the whole business. His skills and devoted efforts in bidding, finding, assisting and monitoring of subcontractors and in designing and supervising final in-house assembly or parts produced by numbers of subcontractors were the largest part of the efforts responsible for plaintiff's operations and success. With almost no capital, plaintiff's 27 employees, led by Mr. Ball, accomplished sales of $2½ million.

It is noteworthy, too, that no serious challenge is made to the $53,000 salary of Mr. King, vice president and Mr. Ball's assistant. The reduction of Mr. Ball's salary to $40,000, as the Government urges would leave him paid less than the assistant whom he trained.

It seems obvious that substantial adjustment is necessary before the average salary paid to executives in comparable industry—even among high-paying companies in that industry—may be used to measure the amount reasonably payable for Mr. Ball's services. *Giles Industries, Inc. v. United States, supra,* 496 F.2d at 563–64, 204 Ct.Cl. at 214–15; *Northlich, Stolley,*

*Inc. v. United States,* 368 F.2d 272, 278, 177 Ct.Cl. 435, 444 (1966); *R. J. Reynolds Tobacco Co. v. United States,* 149 F.Supp. 889, 897, 138 Ct.Cl. 1, 14, *cert. denied,* 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957).

The testimony of the two industry witnesses is directly material on the question of appropriate compensation for Mr. Ball. One of these witnesses, a Mr. Robert Carter, was, in 1967, a chief executive of a neighboring business, also engaged in Government contracting; by the time of trial he was the head of a division of a large industrial concern in Cadillac, Michigan. He confirmed the long hours worked by Mr. and Mrs. Ball and compared his Government-contract bidding efforts with those of Mr. Ball. He had four assistants, each paid about $10,000 a year, whose job it was to get quotations on the elements of the bids they filed. Together he and his assistants were able to file only two or three bids per day as compared to Mr. Ball's 10 to 30. In his judgment, Mr. Ball was worth $100,000 a year.

The second witness, a Mr. William Hoffberg, was a principal in a company engaged in a business similar to plaintiff—characterized by high subcontractor utilization in performing fixed-price Government contracts comparable to plaintiff's contracts, submission of bids without obtaining vendor quotes, comparable space-utilization and volume of sales, but with more employees. This company was in 1967 managed by three persons, two of them co-owners, one of the co-owners being the witness. The three each worked an average of 60 hours per week.

The two co-owners each were paid a base salary of $75,000, plus 25 percent thereof to an I.R.S.-approved pension and profit sharing plan, a total of $93,750 for each. The third officer, the co-owners' assistant, was paid a salary of $40,000, plus a contribution of $10,000 to the pension and profit sharing plans, a total of $50,000.

The Internal Revenue Service in its audit of this company for 1967 disallowed, as unreasonable compensation, a total of $12,-

500 for each of the two co-owners, thereby allowing approximately $81,250 as compensation for each of the two co-owner principals. The total allowed as reasonable compensation for the three officers was $212,500.

While the compensation paid in the metal fabrication industry offers little or no help in the determination of how much Mr. Ball was worth, the situation is somewhat different for Mrs. Ball, who is much more than her husband comparable to the "average" executive. Her relatively low rank of secretary is balanced out by her varied contributions and her devotion to the business.

■ On all the evidence, my conclusion is that reasonable compensation for 1967 for Mr. Ball was $75,000 and for Mrs. Ball $25,000. These conclusions are based primarily on the evidence, throughout the record, of the skills, accomplishments and devotion of Mr. and Mrs. Ball, on the testimony of the two industry witnesses and, as to Mrs. Ball, on the industry figures as well.

The compensation so allowed for Mr. and Mrs. Ball, a total of $100,000, is $59,324 less than the sum paid them, and, as noted above, the sum of $59,324 has been deducted from overhead and added to the profits of plaintiff in the review year.

*Amount of Profit: Inventory Valuation*

A second issue as to the amount of plaintiff's profits in 1967 is raised by defendant's contention that plaintiff's claimed year-end inventory of $503,441 was undervalued by $134,304 and thus that profits should be increased by that amount.

The work-in-process inventory system established for plaintiff by its outside accountant was based on the cost cards kept by plaintiff for each job. The costs of material and labor for the job were recorded as they were incurred and at intervals, usually monthly, the accountant added to the cards 20 percent of the costs shown, in order that each job should reflect its share, albeit an arbitrarily determined share, of overhead. It was not intended, however, that the valuation of inventory should include overhead, and when, therefore, a work-in-process inventory figure was needed, the total on the cards was reduced by 20 percent in order to remove the overhead charge.

The reduction by 20 percent was criticized by an expert witness for the Government as an over-reduction by 4 percent; when material and labor costs of, say, $100 were increased by 20 percent to $120, a reduction of the $120 by 20 percent reduced the total by $24, $4 more than 20 percent of $100.

Further, the inventory valuation method in use by plaintiff took account of partial or full shipment of finished goods by reducing the total on the cost cards by 80 percent of the sales price of the goods shipped. The assumption here was that 20 percent of sales price was profit and 80 percent the cost/value of goods sold. The reduction of cost-card totals by 80 percent would thus remove from the cost/value of work in process the cost of goods which had been shipped.

The use of a generalized 80 percent reduction was criticized by the Government's expert on the ground that in some cases the 80 percent reduction left cards with a credit or minus balance, which would mean that the value of the remaining work in process was "less than nothing." There were also other, lesser criticisms of the evaluation process—of write-downs for losses and of the treatment of progress payments.

At the trial, plaintiff's accountant, as a witness for plaintiff, recalculated the work-in-process inventory as of the end of the review year, without the use of the criticized percentage additions and reductions, with no inventory write-downs and with none of the other challenged entries. The witness, a certified public accountant, took the total direct costs of the jobs still in process as of August 31, 1967, and deducted the percentage thereof equal to the proportion of the total goods which had been shipped. The resulting valuation—of the costs of materials and labor expended for inventory of goods not shipped and still in process at the end of the year—came to

$513,257.85. With two adjustments required for reasons not here important, this post-facto valuation became $508,685, only $5,244 or about 1 percent more than the $503,441 shown on plaintiff's books.

■ This recalculation demonstrates that the accounting method actually used to calculate inventory, simple and imprecise as it may have been, produced a reasonably correct reflection of actual values. The method was appropriate to the needs of the small business involved. The challenge to the inventory valuation on plaintiff's books is rejected.

### Extent of Risk Assumed

Consideration is under section 103(e) of the Act (note 1, *supra*) also to be given, in the determination of excessive profits, to the

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

■ An essential quality of the firm, fixed-price contract is that the contractor assumes responsibility for his costs, with the inevitable risk that greater costs will be incurred than were anticipated, and that the contract will result in loss rather than profit. *Boeing Co. v. Renegotiation Board,* 37 T.C. 613, 643 (1962), *app. dismissed,* 325 F.2d 885 (C.A.9 1963), *cert. denied,* 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). "Acceptance of contracts without escalation or similar protection may involve a risk that the cost of labor or materials may increase." 32 CFR § 1460.12(b)(1) (1974). Among all the kinds of contracts made by the Government, the firm, fixed-price contract, "not subject to any adjustment by reason of the cost experience of the contractor, in the performance of the contract," places "maximum risk upon the contractor" and "imposes a minimum adminis-

trative burden on the contracting parties." ASPR 3–404.2(a), 32 CFR § 3.404–2(a) (1974). The risk is intensified during the shortages which accompany war.

The competitive state of the market (discussed under another factor, below) in which the risk of fixed-price obligations has been assumed may affect the price and thus the risk. Nevertheless where, as in this case, all the business of a contractor is done under firm, fixed-price, competitively bid contracts, he has obviously gone a good distance towards a showing of the assumption of substantial pricing risks of the sort for which favorable consideration should be given. Moreover, plaintiff got little special treatment by "special source" advertisements, "set-aside" quantities limited to small business, or from the failure or omissions of other, lower bidders.

Subject to what is said, below, on the competitive state of the market at the time, plaintiff's pricing and bidding policy was one of close pricing, in the interest of getting the award. A prime example is the revision of its bid price downward, from $577 in the first to $357 in the second contract for the roadwheel assemblies for the Marine Corps. For such revision of prices downward, a contractor is entitled to special consideration.[4]

All of plaintiff's business was not only firm, fixed-price work, but all of it was, also, heavily dependent on subcontractors. The degree of use of subcontractors, already discussed for its bearing on character of business and efficiency, has meaning, too, in the consideration of risks assumed. *See* 32 CFR § 1460.14(b)(3)(iii) (1974). No separation of plaintiff's business as between subcontracted and nonsubcontracted part is possible; all of it was permeated with whatever risks are created by the use of subcontractors. Plaintiff's entire business, therefore, must be regarded as affected—

---

4. 32 CFR § 1460.12(b)(2) provides that:

"The risk assumed by the contractor as a result of its pricing policy will be given particular consideration. A contractor, having initial prices calculated to yield a reasonable profit, who revises such initial prices downward periodically when circumstances warrant, will be given more favorable treatment under this factor than a contractor who does not follow such policy. In order that proper consideration may be given, it is suggested that contractors, when making such periodic price revisions, notify the Board of the action taken in this respect."

favorably or unfavorably—by its involvement with subcontracting.

The Government contractor who subcontracts extensively is, at least in wartime, between two powerful forces, neither of whom bend easily to his will. On the one hand there is the Government, to which the prime contractor is bound by contract; on the other there are the subcontractors, for whom the prime contractor is guarantor, any of whom may cause a default in the primary obligation to the Government.

Almost all of the plaintiff's work took place under standard Government contracts which contain clauses, not negotiable by the bidder, imposing rigorous obligations aside from any fixed-price obligation. E. J. Stone, Contract by Regulation, 29 Law & Contemp.Prob. 32, *passim* (1964). The Government may under a frequent clause buy less than the quantity bid on, at bid unit prices, unless the bidder specifies otherwise. In one case plaintiff bid on 4,052 fittings, for which tooling would cost $1,800. The Government ordered 288 fittings, for a total of $538.56. Under another clause, the Government may buy up a specified quantity more than the contract amount, at the same unit price; in some cases, the Government ordered extra amounts from plaintiff under this "add-on" clause.

There is more flexibility in commercial work than in Government supply as to prices, delivery dates and other contract provisions; some companies prefer not to do Government fixed-price prime-contract work and some even decline it. Substitutions or departures from specifications are not permitted under the Government contract, at least not without burdensome applications which must commend themselves to the approval of the officers of the Government's procurement system. Drawings are sometimes old, incomplete, inconsistent and ambiguous. While extensions of time and extra payment are available if there is Government fault in the drawings, errors in interpretation of drawings are not the fault of the Government. Such errors are common, and occurred in plaintiff's

work during the review year. A miscalculation in a bid, a botched job by an engineer, a misread specification—any of these all too possible events may mean no profit or worse. Plaintiff suffered such mishaps in the year under review.

Dangers are particularly present when bidding on a product for the first time. Every item bid on with which the bidder has little or no familiarity, either as to manufacturing process or bid history, presents a threat of loss. "Contractors may guarantee quality and performance of the product notwithstanding uncertainties as to the quality obtainable from their plants, particularly with respect to products which may be more or less abnormal to them." 32 CFR § 1460.12(b)(1) (1974).

In a large (and on the record not precisely determinable) part of its work, plaintiff was bidding on items it had not made before. A loss in a substantial contract for an item of this kind can dissipate profits for the whole year. For example, in 1969 plaintiff bid successfully on a Government contract for a decontaminating apparatus. Unanticipated difficulties were encountered in production, additional costs were incurred, and plaintiff suffered a loss which caused an operating loss for the year of $260,000 on renegotiable business, while nonrenegotiable business showed a 27 percent profit. Other manufacturers, too, suffered losses the first time they produced the unit. The setting for the loss—the unit was large, contained many parts and had not been earlier produced by plaintiff—could just as well have applied to the roadwheel assemblies which accounted for a third of plaintiff's total sales for the year 1967.

Among the more burdensome obligations in the Government contract is that of the contract delivery date, buttressed by threat of termination for default, liability for excess procurement costs and, often, liquidated damages. "Contractors may assume risks by guaranteeing delivery schedules notwithstanding possible inability to obtain needed materials or labor." 32 CFR § 1460.12(b)(1) (1974). A frequent misfortune of the prime contractor who is heavily

dependent on numbers of subcontractors, is delivery later than the due date. Any delay in the shop of one of the subcontractors may upset the contract timetable for the movement of the parts, pieces and assemblies through the necessary sequence of subcontractors towards assembly of the final product.

Having assumed contract obligation as to fixed-price, specifications and delivery date, the prime contractor assumes the risk of his subcontractors' failure to perform. "Contractors who subcontract work, the performance of which they guarantee, in general assume a greater risk than contractors who retain performance entirely within their control." 32 CFR § 1460.12(b)(1) (1974). The risks are multiplied when a contractor uses numbers of subcontractors who are in sequence to perform interlocking operations on one product. The parts and pieces and assemblies of parts must not only move along on schedule but they must also be well made, in compliance with specifications. The small subcontractor typically does not accept responsibility for the consequences of his delays and other faults, leaving the prime contractor to face the consequences, the least of which may be the necessity of applying for an extension of time, to be granted only on condition of a money payment.

Subcontractors limit their liability for defective work; some, for example foundries and machinists, will not accept liability for the costs in the onward process attributable to defects in their work. One of plaintiff's simple jobs, a bomb lug or hanger, resulted in a 50 percent loss when porosity and hard spots were encountered in the castings. Plaintiff's subcontractor supplied new castings, but increased the costs of machining, which had to be paid by plaintiff. Defects may occur in any casting; there was a risk of hard spots in castings for many of plaintiff's contracts during the review year, including the two Marine Corps roadwheel contracts.

Unexpected rises in costs are another common hazard for those who extensively use small subcontractors. Plaintiff's subcontractors in the main operated with price escalation clauses in their favor. Sixty percent of the value of plaintiff's purchases in 1967 ($1.2 million of $2,088,000) were made under contracts containing such clauses. Many subcontractors reserved the right to ship 10 percent more or less than the quantity ordered. Some wanted earlier payment than agreed; good business required that plaintiff pay.

When the conditions of the work do not suit a subcontractor, he will refuse to do the job. Such an episode accounted for the single instance in which a contract held by plaintiff was terminated for default during the review year. A subcontractor took exception to onerous contract provisions and refused to do the work. Plaintiff was unable to locate another, defaulted and was required to reimburse the Government for additional reprocurement costs, in the amount of $2,224.71, about 20 percent of the amount of the contract.

The contract price is the prime contractor's compensation. And of course not all of the risks of loss eventuate, of if they occur, do not cause a substantial loss. Nevertheless, the plaintiff's experience shows that the risks described above were neither speculative nor unlikely. 32 CFR § 1460.12(b)(1) (1974).[5] *B–E–C–K McLaughlin & Associates v. Renegotiation Board*, 38 P–H Mem. T.C. Mem 1969–15, ¶ 69105, 13 CCF ¶ 82,481 (1969), *aff'd.* 443 F.2d 1180 (C.A.9, 1971). Prosperous as plaintiff was in 1967, its profits went down to $143,000 in the next fiscal year, 1968. It

---

**5.** "In general, the [Renegotiation] Board will consider whether the contractor's performance of renegotiable business is free from risk, or subject to it, on the basis of actual experience and not mere speculative or unlikely possibilities. The Board will give special consideration to evidence showing risks through actual realization of losses incurred by the contractor in performing contracts in other years similar to the contracts undergoing renegotiation, and losses incurred in the same or other years by concerns other than the contractor, especially when connected with the contractor in any way, and in performing similar contracts." 32 CFR § 1460.12(b)(1) (1974).

suffered a loss of $260,000 in 1969, and it made profits of only $20,000 in 1970, though the nature of its business remained the same (except that its space increased and its employees increased in number). This evidence of plaintiff's modest profits and even losses in years shortly following 1967 confirms that the business of plaintiff was highly risky. 32 CFR § 1460.12(b)(1), note 5, *supra.*

The risks inherent in the plaintiff's system of subcontracting increased, moreover, as the Government's demand rose. With each successive contract, the volume of goods moving from one processing shop to another increased, and the network of subcontractors increased. With this increase, plaintiff's monitoring and overseeing job grew more difficult, and the risk steadily increased that a marginal or an overbusy subcontractor would fail to produce the quality and volume needed, or in the time specified. In a word, the greater the Government's demand, the greater the volume of sales, the greater, for plaintiff, the risks assumed. This increase of risk is to be given effect in the consideration of the reasonableness of plaintiff's profits from the increased demand of the Government, in 1967, a time of war.[6]

■ The conclusion must be that the undertaking by plaintiff to produce what it did, at firm, fixed prices, by the large-scale use of subcontractors, in 1967, in time of war, as the Government's procurement was on the rapid increase, was a commitment with very substantial economic risks. Risks permeated plaintiff's entire business, and plaintiff is entitled to highly favorable consideration under the risk factor.

### Contribution to the Defense Effort

■ The statutory factor of "nature and extent of contribution to the defense effort" includes "inventive and developmental contribution and cooperation with the Government and other contractors in sup-

plying technical assistance." Section 103(e)(4), note 1, *supra.*

Plaintiff contributed none of the "experimental work," "new inventions" and the like which are usually thought of as a contribution to the war effort. 32 CFR § 1460.13(b) (1974). But plaintiff nevertheless made a real contribution in producing an abundance of high quality goods needed for the prosecution of a war, by the skillful and energetic marshalling of the efforts of small subcontractors all over the country, who "might otherwise have been overlooked or passed by." (32 CFR § 1460.14(b)(3)(ii) (1974), note 3, *supra.*) This was surely an "unusual contribution" or "performance, assistance or service otherwise exceptional" qualifying as a contribution to the defense effort deserving of favorable consideration in the determination of reasonable profits under the Act. 32 CFR § 1460.13(b) (1967); 32 CFR § 1460.13(b) (1974); *Boeing Co. v. Renegotiation Board, supra,* 37 T.C. at 645.

### Net Worth

Section 103(e), note 1, *supra,* requires consideration, also, of

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

Plaintiff's capital in the year 1967 was $212,793. Opening net worth was $69,571 and closing net worth was $284,704.87. Plaintiff invested, during the year, $57,385 in an airplane.

■ Plaintiff also received progress payments, during the year under review, in the amount of $973,624. Such progress payments are held to mean that the contractor is not entitled, as an element of its profit, to sums designed to compensate for the costs of financing working capital. *LTV Aerospace Corp. v. Renegotiation Board,* 51 T.C. 369, 406 (1968); *cf. Aerojet-General Corp.,* ASBCA No. 17171, BCA 74–2, ¶ 10,863. When Mr. Ball bid on a con-

---

**6.** The Renegotiation Board regulations dealing with the sharing as between contractor and Government of the profits flowing from increased demand by the Government, refer to

"added risk assumed" by the contractor as warranting a larger portion for the contractor. 32 CFR § 1460.10(b)(3) (1974).

tract providing for progress payments, however, he did not include in his bid an item for interest.

Plaintiff's renegotiable profits of $478,-297 are plainly an exceedingly high return on capital and net worth and would be patently excessive[7] if the basis for the determination of reasonable profits were to be the return on capital or net worth employed. Plaintiff's business is not, however, a capital-intensive business, but rather one involving mainly management and productive skills devoted to the organization of the capital resources of others, its subcontractors. *Cf.* 32 CFR § 1460.11(4) (1974), note 7, *supra.* The return on the capital invested is therefore not an appropriate measure for the reasonableness of plaintiff's profits, witness that the Government itself is contending for a determination of excessiveness (and a total profit) which would allow plaintiff a 254 percent return on net work.

It would be as unfair to judge the reasonableness of plaintiff's profits by a "normal" rate of return on capital invested or on net worth as it would be to use that standard in passing on the reasonableness of the profits of such plainly service businesses as a testing laboratory, a geological prospecting firm or a law firm. *Cf. X–Ray, Inc. v. Renegotiation Board,* 28 P–H Tax Ct. Mem. 459, 7 CCF ¶ 71,117 (1959).

In sum, the small amount of capital or net worth, here, is not a criterion for the judgment on excessiveness, except insofar as the amount of plaintiff's capital and net worth are no support for the retention by plaintiff of anything like the profits it actually made.

### *Reasonableness of Plaintiff's Costs and Profits*

Plaintiff's sales, costs and profits in 1967, the year under review, were as follows:

| | Total | Nonrenegotiable * | Renegotiable * |
|---|---|---|---|
| Net Sales | $2,599,060 | $16,118 or 0.62% | $2,582,942 or 99.38% |
| Direct Costs | (1,828,805) | * (11,339) | * (1,817,466) |
| Overhead (claimed overhead of $348,298, less $59,324, disallowed as compensation | (288,974) | * (1,792) | * (287,182) |
| Net profit | 481,281 | * 2,984 | * 478,297 |
| Profit as percent of Sales | 18.5% | 18.5% | 18.5% |

\* The allocation of costs, overhead and profits as between nonrenegotiable and renegotiable elements is on the basis of the percentage of each type of sales, 0.62 percent nonrenegotiable and 99.38 percent renegotiable.

---

**7.** The regulations of the Renegotiation Board provide (32 CFR § 1460.11(b)(4) (1974)):

"(4) The relationship of profit realized on renegotiable business to the capital and net worth employed in renegotiable business will be used as one of the considerations in the final determination of what constitutes excessive profits.

"A contractor who is not dependent upon Government or customer financing of any type is entitled to more favorable consideration than a contractor who is largely dependent upon these sources of capital. When a large part of the capital employed is supplied by the Government or by customers, the contractor's contribution tends to become one of management only and the profit will be considered accordingly."

*See* also *Operations and Activities of the Renegotiation Board,* Report of the Comptroller General to Congress No. B–163520, May 9, 1973, 35–36; *cf. Efficiency and Effectiveness of Renegotiation Board Operations, Report of the House Committee on Government Operations,* H.R. Rep. 92–758, 92d Cong., 1st Sess. (1971) 14.

Sales and profits prior to 1967, to plaintiff's beginnings in 1965, were as follows:

|  | Sales | Profits | Profits as a percent of sales |
|---|---|---|---|
| Prior to incorporation, without provision for compensation to proprietors: |  |  |  |
| 1965 | $104,968.65 | $13,834.25 | 13.18% |
| 1966 (first 6 mths.) | 292,433.38 | 89,883.50 | 30.74% |
| Following incorporation and with provision for executive compensation: |  |  |  |
| July–August 1966 | 153,720.45 | 25,125.52 | 16.34% |

Sales and profits have decreased in the years since 1967, as follows, though the nature of plaintiff's business has remained substantially unchanged, except that the space it occupies has been increased substantially and the number of employees has gone up substantially:

| Fiscal Year | Sales | Profit or (Loss) per Plaintiff's Books | Profit or (Loss) per I.R.S. Audits |
|---|---|---|---|
| 1968 | $1,977,384 | $88,276 | $143,267 |
| 1969 | 1,621,393 | (265,606) | (218,005) |
| 1970 | 1,246,337 | 1,658 | 20,318 |
| 1971 | 1,404,617 | 85,410 |  |
| 1972 | 1,791,111 | 160,353 |  |

The Act directs that the "reasonableness of costs and profits" shall be considered "with particular regard to volume of production, normal earnings, and comparison of war and peacetime products." Section 103(e)(1), note 1, *supra.*

Unfortunately, plaintiff had no "normal" earnings and no "peacetime products" sufficient for useful assessment under this factor. Plaintiff's whole existence, prior to the year under review, was brief. In the year 1965 plaintiff was just beginning in business. The first 8 months of 1966, before the start of the fiscal year now under review, was a period of rapidly rising but still small sales of $466,153, too short a period and too small a total on which to base comparisons. Profit figures for 6 of the 8 months, the period prior to incorporation in June 1966, moreover, made no provision for compensation to proprietors. The statutory references to "normal earnings" and a comparison with "peacetime products" is therefore, as the Government and plaintiff seem to agree, not here possible of application, and no historical base is available by which to measure plaintiff's profits in 1967.

It has not been contended that plaintiff's profits and losses in the post-1967 years might be considered its "normal" earnings or that its products in those years might be considered "peace time." Aside from any question as to whether the statutory language looks only backward in time,[8] the record would not support any theory that the post-1967 years were normal.

The Act contemplates determinations of profits for excessiveness on a year by year basis, without offset or adjustment of profits by reason of losses in years other than the year under review; explicit, limited exceptions are made for loss carryforwards. Sections 103(f), 103(m), 105(a), 50 U.S.C.

**8.** The first full-scale Renegotiation Act, the Revenue Act of 1943, used the phrase "normal pre-war earnings." Section 403(a)(4)(A), ch. 63, 58 Stat. 78, 79, 50 U.S.C. App. § 1191(a)(4)(A) (1970). In the reenactment of 1951, reference to "pre-war" earnings was presumably deemed inappropriate and the phrase was shortened, in present section 103(e) (note 1, *supra* ) to "normal earnings."

App. §§ 1213(f), 1213(m), 1215(a) (1970); *see* 32 CFR §§ 1457.1, 1457.8, 1457.9, 1459.5, 1460.2(d), 1460.10(b)(1) (1974). The data on profits and losses in the years following 1967 are therefore of little relevance on the reasonableness of plaintiff's profits in 1967, although as noted above they have relevance to the risks assumed by plaintiff.

The statutory subfactor remaining for application is "volume of production." Section 103(e), note 1, *supra*. If by this is meant absolute volume, rather than relative volume of war and peacetime production, then certainly plaintiff scores well. It produced, for its size, mightily. In the first 6 months of 1966 its production was under $50,000 monthly, in the next 2 months slightly over $75,000 monthly, and in the next year, the year under review, over $215,000. The regulations of the Renegotiation Board state that: "Favorable consideration will be given to an increase in volume of production for defense purposes." 32 CFR § 1460.10(b)(3) (1974).

Profits from increases in volume of production to meet increased Government demand, however, may under certain circumstances be required to be shared with the Government. This principle is stated in the regulations of the Board in the same breath as the provision just quoted promising favorable consideration for an increase in volume of defense productions (*ibid.*):

> (3) Favorable consideration will be given to an increase in volume of production for defense purposes. On the other hand, when the Government's demand has enabled the contractor to increase his sales without exceptional effort and without corresponding increases in costs, decreased unit costs result, and the Government should normally get the principal benefit in more favorable prices, or in renegotiation. In many cases, the contractor may establish that factors related to the increased volume, such as developmental contribution, added risk assumed, or added investment of capital, entitle the contractor to claim a larger share of the benefit resulting from increased volume, but to the extent that this is not shown, the margin of profit on expanded renegotiable sales should be adjusted in reasonable relationship to the expanded volume. Increase in volume made possible by increased subcontracting may often not involve any cost savings, and will involve problems discussed under other factors. See §§ 1460.12 and 1460.14.

Invoking the principle underlying the foregoing regulation, the Government maintains that plaintiff's profits were the result, not of plaintiff's merits, but of the greatly expanded volume of military procurement in 1967 for the war in Southeast Asia and a concommitant falling off in competition. The Government contends that plaintiff's profits of $666,850 are excessive by $490,000, leaving plaintiff with adjusted sales of $2,092,942 ($2,582,942 − $490,000 = $2,092,942) and reasonable profits of $176,850 ($666,850 − $490,000 = $176,850), a ratio of profits to sales of 8.5 percent ($176,850 divided by $2,092,942 = 8.5). A ratio of profits to sales of 8.5 percent is said to be more than the average percentage in industries similar to plaintiff's business, as follows:

|  | Percent of Net Profits to Sales |
|---|---|
| Manufacturers of "Miscellaneous machinery, except electrical" per *Dun & Bradstreet's Annual Survey*, "Ratios of Manufacturing for 1967" | 4.38–14.58 |
| Fabricators of wire products and miscellaneous fabricated metal products with assets of $1–5 million, per I.R.S. *Corporation Source Book of Statistics of Income, 1967* | 8.4 |
| F.T.C.–S.E.C. *Financial Report of Manufacturing Corporations*, 4th Quarter 1967: | |
|     Metal working machinery and equipment | 9.4–11.0 |
|     Other fabricated metal products manufacturers | 7.4–8.7 |

The Government further urges that Mr. Ball unthinkingly made bids at random, some of them falling in by reason of the expansion in procurement for the Vietnam war; on this theory, it is said, plaintiff's 1967 profits were undeserved, a windfall, and should be greatly reduced. A Government witness theorized that a contractor might "pump out" bids without supporting quotes and then by one method or another "wriggle out" of unprofitable awards, either at the pre-award survey or by use of the certificate of competency procedure of the Small Business Administration. Facts showing that plaintiff did this were completely lacking.

The contention that procurement for the Vietnam war caused a decline in competition in 1967, is not, however, so readily to be dismissed. The year under review was a period of greatly increased military procurement for the war in Southeast Asia, and the expansion in procurement was doubtless a "but for" cause of a substantial part of the increase in plaintiff's total sales in this period.

■ With the increase in Government procurement for war it was inevitable that there would be fewer bids or bids at higher prices by contractors already busy to capacity and beset by wartime scarcities of labor, materials and shop capacity. As procurement expanded, competition waned and prices and margins of profit necessarily rose. Profits from this source are the objective of the Renegotiation Act, which is aimed at profiteering and is intended to recoup the unreasonable excessive portion of the profits from war and defense production, without deterring the efficient and voluminous production of the goods needed for defense and war. *Lichter v. United States*, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) *passim* and at 760 n. 6, 68 S.Ct. at 1304, 92 L.Ed. at 1712.

Plaintiff's 1967 profits were in part the product of the decline in competition by reason of the Government's expanded program for the procurement of war goods, but only in part. Many of the indicia of active competition are present in plaintiff's operations in 1967. Plaintiff got all its contracts by competitive bidding. None of the goods it produced were of the sort—missiles, bombs or warships—which in practice can be produced by only a few companies already overloaded with orders. With no great help from the Government, plaintiff competed with large and small companies that had previously manufactured and even designed and possessed the tooling for the items under bid; some of the contracts awarded plaintiff were obtained in competition with such companies.

■ In only 8 percent of its contracts, by volume of sales, was plaintiff the only bidder. Mr. Ball testified, credibly, that he would bid on small items that nobody else would "fool with." In the 90 percent of cases where others bid, plaintiff's bids were not a mere shade lower than other bids, but substantially lower. In a group of 92 contracts shipped, the average of the bids next higher than plaintiff's was 152 percent of plaintiff's bid; the average highest bid was 211 percent higher than plaintiff's bid.

The Government, well supplied with previous price history and its own, internal estimates of the cost of the items advertised, stood ready to cancel solicitations whenever it felt that all the bids were unreasonable. Actually, 47 of the solicitations on which plaintiff bid were cancelled for this reason. Of these, plaintiff was the low or only bidder in 12; in 35 there was a higher bid than plaintiff's.

No showing has been made, whether by comparison of plaintiff's successful bids with Government-estimated costs, with earlier costs or with earlier bids by plaintiff or otherwise, that plaintiff quoted increasingly high prices or sought otherwise to take advantage of the decrease in competition and the consequent shortage of available contractor capacity. It rather appears that plaintiff fought hard to get the business, and lowered its prices to do so. A striking illustration appears in the roadwheel assem-

bly contracts, plaintiff's largest job in 1967, where in the second contract plaintiff lowered its bid from $577 to $357.

It is therefore concluded that plaintiff's own competitive efforts were a substantial cause and source of its prosperity in 1967; the wartime lessening of competition could not have been the sole source of plaintiff's success. *Compare Armstrong v. War Contracts Price Adjustment Board,* 15 T.C. 625, 637 (1950), *aff'd* 90 U.S.App.D.C. 152, 194 F.2d 875 (D.C.Cir.), *cert. denied,* 343 U.S. 967, 72 S.Ct. 1059, 96 L.Ed. 1363 (1952); *X–Ray, Inc. v. Renegotiation Board, supra.*

The refinement, so far as possible, of the effect of the distorted market on the subject part of plaintiff's profits, in terms of excessiveness of profits, is left for the conclusion, below, in which all the factors are weighed.

### The Factor of Fair and Equitable Dealing and the Public Interest

█ Also to be considered are any other factors required by "the public interest and fair and equitable dealing." Section 103(e)(6), note 1, *supra.* The public interest requires both that unreasonable profits be recouped and that sufficient profit be allowed as will promote the production in volume of quality goods for use in war and defense production. Fair and equitable dealing with the contractor demands that he be given full measure of the favorable consideration contemplated by the statute.

### CONCLUSION

The record provides no basis for a precise division of the dual causation of plaintiff's profits as between plaintiff's merits and the market distorted by war. A determination in the nature of a jury verdict is, therefore, made that half of the plaintiff's renegotiable sales are to be attributed to plaintiff's

own merits, unaffected by the decline in competition, and half are to be regarded as affected by the diminution of competition by reason of the increased level of Government procurement for war, and therefore subject to sharing with the Government.

The profits on the half of plaintiff's sales held attributable to plaintiff's own qualities are determined not to have been excessive within the intendment of the Renegotiation Act. Though made possible by the war and the consequent increase in Government demand, these profits were the product of plaintiff's merits and efforts: its "exceptional effort" (32 CFR § 1460.10(b)(3), *supra* ), its competitiveness, high efficiency, its contribution to the defense effort, and the substantial risks it assumed in undertaking fixed-price production of the variety of products involved by means of extensive and intricate subcontracting.

█ On the record made here, these profits were reasonable. Under the stated policy of the Renegotiation Act, only excessive profits are to be eliminated from contracts with the United States in the interest of the "sound execution of the national defense program." Section 101, 50 U.S.C. App. § 1211 (1970). No rule or principle says that the profit made on the highly efficient production for war of good quality material in volume is excessive when it exceeds the contemporaneous statistical average profit of comparable industry, composed of good, bad and indifferent producers. The Renegotiation Act does not require that a small contractor who in a risky business makes a contribution to the defense effort by the efficient production of large amounts of war goods at low prices shall have its profits reduced to the level of an average producer making average profits.[9] The very purpose of the statutory system for the determination of excessiveness on the basis of the several prescribed

---

**9.** When the circumstances have warranted, profit-ratios-to-sales of 18 percent, and more, have been held reasonable and not excessive. *B–E–C–K McLaughlin & Associates, supra,* (profits of $904,669 on sales of $4,848,918; 18.-66 percent); *Offner Products Corp. v. Renegotiation Board,* 13 CCF ¶ 82,173 (1968) (profits

of $205,257 on sales of $602,971.10; 34.04 percent); *Martin Mfg. Co. v. Renegotiation Board,* 44 T.C. 559 (1965) (profits of $270,298 on sales of $1,495,950; 18 percent); *cf. Winfield Mfg. Co. v. Renegotiation Board,* 17 CCF ¶ 80,977 (1971).

factors, without the use of any single formula, was to permit flexible adjustment to just such a case as is here presented. Were the renegotiation law to "treat the effective producer the same as the ineffective producer, the high cost producer the same as the low cost producer . . . an important incentive to the able and efficient would be lost." [10]

The plaintiff's profits on the remaining half of its 1967 sales are, however, subject to sharing with the Government, as in part the product of a sharply increased Government demand, in wartime, with a consequent distortion of the competitive market. Half of total renegotiable sales of $2,582,-942 is $1,291,471; half of total renegotiable profits of $478,297 is $239,148. The question is, therefore, what was the excessive portion of the profits of $239,148.

Consideration of the amount to be recouped as excessive begins, in this case, with the statistics of profits earned by comparable industry. Among the industries on which there is evidence in the record, that of manufacturers of "miscellaneous machinery, except electrical" is for the present purpose closest to plaintiff. This industry had a range of profit, i. e., profit as a ratio of sales, of 4.38 to 14.58.

The other industries on which statistics from different sources were introduced in evidence where the "fabricators of wire products and miscellaneous fabricated metal products industry," with a profit ratio of 8.4 percent, the "metal working machinery and equipment" industry with a range of profit ratios from 9.4 to 11.0 percent, and "other fabricated metal products manufacturers" with a range 7.4 to 8.7 percent. These are rejected, in favor of comparison with the "miscellaneous machinery, except electrical" industry, because the complexi-

ties and hazards of the plaintiff's business and the variety of products it produced in my opinion create a wider rather than a narrower possible range of profits for its members. The "miscellaneous machinery, except electrical" industry, with its wider range of profit ratios, is therefore the more comparable one.

In favorable recognition of plaintiff's efficiency and its other qualities described above, the high-range rate of 14.58 percent profit in the "miscellaneous machinery, except electrical" industry will be applied here as reasonable for plaintiff. The application of the allowed rate of 14.58 percent to the sales of $1,291,471 presently under consideration gives a profit of $188,296, which is found to be reasonable.[11] The difference between the actual profits of $239,148 and the reasonable profits of $188,296 is $50,852, which is found to be the excessive portion of profits.

The allowed rate of 14.58 percent is deemed reasonable in part because of reasons associated with the comparability between plaintiff's business and the "miscellaneous machinery, except electrical" industry. Comparison of plaintiff with a manufacturer of "miscellaneous machinery, except electrical" is at best imperfect, and the use of the maximum in the profit range of that industry compensates for possible injustice to plaintiff from the use of the standard. The maximum is utilized because it is the Government that has the burden. Not having shown that plaintiff should be compared with the manufacturer at the bottom, mid-point or any particular point on the scale from 4.38 to 14.58, and having in mind the uncertainties of plaintiff's business and the variety of its products the Government has proven only comparability with the manufacturer who made profits, at

---

10. *Renegotiation of War Contracts,* Additional Report of the Special (Truman) Committee Investigating the National Defense Program pursuant to S. Res. 71, 77th Cong.S.Rep. No. 10, part 5, 78th Cong., 1st Sess. 6 (1943).

11. The Renegotiation Board's regulations provide that the amount of excessive profits is deducted from sales, as well as from profits, for

the purpose of determining "the relation of retained profits to sales." 32 CFR § 1460.3 (1974). The decision made here is not a determination that a particular percentage of profit is reasonable or that the excess over a certain percentage is excessive. The decision here, as stated in the text, is that $50,852 or plaintiff's profits in 1967 were excessive.

the top of the scale, of 14.58 percent of his sales.

But the predominant reason for the application of the high range profit ratio rather than a lower range ratio on the half of plaintiff's profits now under consideration, is the favorable consideration to which plaintiff is entitled under the several statutory factors determinative of excessive profits.

■ First, highly favorable consideration is given to plaintiff for the efficiency with which it produced in volume quality material for the prosecution of war. In enacting the Renegotiation Act of 1951 Congress singled out efficiency as the one factor for which "favorable recognition must be given." § 103(e), note 1, *supra.* In earlier legislation, all the factors, efficiency among them, had been required, equally, to be "taken into consideration." Sec. 403(a)(4)(A), Act of 1943, *supra.* The distinction given efficiency by the new language, the Senate Committee on Finance reported, "will promote efficient operations by furnishing a strong practical incentive." S.Rep.No. 92, 82d Cong. 1st Sess. 9 (1951). The use of the high range profit ratio here to recoup as excessive only $50,852 of total renegotiable profits of $478,297 will provide such "strong practical incentive."

Plaintiff has also deserved and been given favorable consideration under the other statutory factors considered above, notably for the risks it assumed in producing under its extensive and intricate system of subcontracting. In the special circumstances of this case, described under "Risks Assumed", above, there is no room for the principle by which a lower rate of profit is allowed for subcontracted production than

for in-house production. 32 CFR § 1460.-14(b)(3)(i), note 3, *supra.*

Under the factor of risks assumed, plaintiff also receives much favorable consideration for its close pricing and commendable competitiveness in producing on a firm, fixed-price, lowest-bid basis. While the half of plaintiff's sales and profits now under consideration were in part the product of a distorted market, in which competition had declined, plaintiff took no undue advantage, but rather assumed large risks, added to by the increase in demand, to produce as competitively as it knew how. The risks and the efficiency displayed in producing in volume to meet the added demand outweigh the advantages plaintiff got from the diminution in competition.

The judgment, finally, is based on plaintiff's advancement of the Congressional policy of encouragement of small business and the additional factor that plaintiff is itself a small business. "Considerations of company size" may properly affect the application of the statutory factors. 32 CFR § 1460.-8(b) (1974).[12] That plaintiff is itself a small business heightens the regard it deserves for its efficiency, for the risks it assumed, for its extensive use of small business subcontractors and for the other of its merits and achievements.

Both purposes of the Renegotiation Act— the elimination of profiteering in defense contracts by the recoupment of excessive profits and the allowance of sufficient profit to motivate war production in volume— will be accommodated by the judgment here made that plaintiff's profits in 1967 were excessive in the amount of $50,852. Judgment in this amount will serve to give incentive in the form of profit to this plaintiff, to others like it, and to industry in general to make the effort and assume the

---

**12.** "Characteristics inherent in the operation of a small company, if shown to be relevant in a particular case, are taken into consideration by the Board in applying the factors described in section 103(e) of the act. For example, under the efficiency factor, it may be shown that a small contractor, through greater flexibility, was able to schedule and complete the performance of a contract more expeditiously than his larger competitors, or that by closer person-

al supervision he achieved lower costs or a better product. Under the risk factor, the small contractor undertaking renegotiable production unrelated to his ordinary commercial business may be shown to have been endangered to a greater extent than larger contractors by the possible cancellation of the Government program. Considerations of company size may also affect the application of other factors." 32 CFR § 1460.8(b) (1974).

risks required to produce efficiently to meet the nation's needs for goods in defense and war. The retention by plaintiff of $427,445 of its renegotiable profits of $478,297 in the circumstances does not give excessive profits.

Accordingly, it is for the foregoing reasons held that plaintiff's profits in 1967 from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951 were excessive within the meaning of the Act in the amount of $50,852. Judgment for the United States in this amount, less appropriate tax credits, should be entered on defendant's counterclaim, with interest as provided by law.