Per Curiam:
This is a petition, originally filed in this court, for redetermination of plaintiffs excessive profits for its fiscal year ended June 30, 1967. We have jurisdiction under 50 U.S.C. App. § 1218, as amended. The Renegotiation Board, by unilateral order dated November 23, 1971, determined that plaintiff realized excessive profits in the said 1967 fiscal year in the amount of $125,000, ($111,676 after adjustment on account of state income taxes, and before computation of the federal tax credit), leaving it with 11.3% of profit on its renegotiable sales. See Chart A for summary.
The case was tried before Trial Judge David Schwartz who has submitted a recommended decision and conclusion of law under Rule 134(h). He would reduce the determination to $67,000 and both parties except. After briefing and oral argument, the court agrees with the said recommended decision and adopts the same as its own, except that it does not agree with a few statements and findings by the trial judge, as will be set forth hereinafter. Because of the precedential importance of the matters wherein we differ, we have elected to leave Trial Judge Schwartz’s opinion to stand and to state in this preliminary discussion how we support his conclusion in part on other grounds. Thus, the thrust of our independent conclusions will more plainly appear. We adopt as our own the findings of fact, except as specified hereinafter, but they are not printed herewith, having been furnished to the parties. All the most significant facts are stated in the opinion.
The case was tried in February 1975, and the defendant benefits from the nonapplication to this case of the standards of proof defendant must in future meet as announced in Major Coat Co. v. United States, 211 Ct. Cl. 1, *648 543 F.2d 97 (1976). We labor to construct an informed and reasoned excessive profits redetermination from the scanty materials furnished here.
The plaintiff, a Pennsylvania corporation with a place of business at Blue Bell, Pennsylvania, was organized in 1962 and in its first years was engaged almost wholly in research and development (R&D) under defense contracts and subcontracts. Its area was apparently solution of problems involving aviation, electronics, and optics. In its year ending June 30, 1966, it took on a large amount of production work, wholly or almost wholly the manufacture of devices it had itself invented, designed, and tested. In
1966, for tax reasons, it incorporated a wholly-owned manufacturing subsidiary, D. C. Products, Inc., which had from the first a calendar fiscal year. D. C. Products’ sales were to plaintiff except for inconsequential quantities. Years prior to 1966 were not comparable to 1967 due to the absence of production contracts and were not renegotiated because the defense business was below the statutory floor. The renegotiation of the parent’s 1966 fiscal year was conducted on a basis consolidated with the subsidiary’s January-June figures, showing $1,965,000 of consolidated renegotiable sales and consolidated profits of 12.5% thereon, and the Renegotiation Board issued a clearance. The R&D work was only 19% and production 81% that year.
The business as it developed in 1966 and continued in 1967, operated on or beyond the periphery of available technology, where ambitious tasks were assigned, and where failure in a portion of them was to be expected, and did not necessarily reflect discredit on the contractor. Even in the production stage of the business, the products were new, the producer’s inventions and not produced by others; if it appeared by hindsight they were put in production too soon, this was as likely the mistake of defendant or its prime contractors as of plaintiff. There was a situation of immediate war necessity where the inventions, if successful, met keenly felt wants. David Bushnell did not wait to perfect his submarine before he tried to torpedo the British Warship EAGLE in 1776. Hence, the trial judge properly disregards some evidence of defective performance.
*649 In renegotiation of the parent for 1967, the subsidiary was not consolidated, because consolidation was allowable but once when the companies had different fiscal years. The R&D work had risen to 26% of the total and production was 74%. The nonconsolidation of the subsidiary operated unfavorably to the contractor as the "value added” was correspondingly reduced. "Value added” is normally a necessary element under the factor "Character of Business” to justify as reasonable a substantial profit on a manufacturing operation. Butkin Precision Mfg. Corp. v. United States, 211 Ct. Cl. 110, 129, 544 F.2d 499, 509 (1976). D. C. Products, Inc. was renegotiated the same time as the parent. The record shows that plaintiff had requested "concurrent” renegotiation and the practical difference between that and the simultaneous renegotiation that occurred does not appear. The Board cleared the subsidiary and made the assessment above-stated against the parent.
Upon the publication of Renegotiation Staff Bulletin 25 in 1957 (not then published in F.R. or C.F.R.), the Board was committed to the proposition that renegotiation was intended to apply to affiliated or related contractors, in the absence of different and substantial minority interests, "on a collective group basis,” and that "the excessive profits of persons performing defense contracts should be determined with respect to the totality of their operations.” "Consolidation is merely a technique of convenience,” not a "means of producing different substantive results.” The same result should be generally reached if the members of the group are renegotiated separately but concurrently. This Bulletin was afterwards, in 1959, revised, and was published in the Federal Register, 34 F.R. 7436 in 1969, and is now part of the Code, 32 C.F.R. § 1499.2-18 (Rev. 1976). It is shortened and much of the above language is left out; however, loss offset was still allowed in concurrent renegotiation of related but unconsolidated companies. But concurrent renegotiation was limited to companies that could have consolidated. The original 1957 language is believed to state the intent of Congress correctly. See comment in Nichols, Equalizing Profit and Loss in Renegotiation, 45 Va.L.Rev. 41, 54 (1959). Thus, the unavailability of consolidation here should not have affected or controlled *650 the result. The best method of ascertaining how the case would have come out under consolidation is actually to construct consolidated figures as a check on the reasoning and the application of the statutory factors and not as a basis for the final determination. With unchallengeable propriety (though challenged by plaintiff nevertheless) defendant’s expert, Dean Edward M. Kaitz of the Georgetown School of Business Administration, and the trial judge, have both done this here. The reasons are unusually cogent: (1) the use by parent and subsidiary of the same plant, without segregation; (2) the use by the subsidiary of the parent’s inventions as the designs of its products; (3) the fact that the inter-company billings are controverted and shown to be more than predictably lacking in artistic verisimilitude; and (4) only by consolidating the review year can it be effectively compared with 1966.
The effect of consolidation of the parent’s sales and costs with those of the subsidiary over the same period, 12 months ending June 30, 1967, is to increase the ratio of profit to sales (as adjusted by the trial judge), from 16.1% unconsolidated to 20.6% consolidated for 1967, as compared to 12.3% consolidated for 1966, but the apparent adverse effect to the contractor is alleviated by the fact that it can now claim substantial value added as to the articles purchased from D. C. Products. Cf. Board comment in its statement of facts and reasons. The same company’s 1966 and 1967 results stand out as the best and to all intents the only evidence (as we will show below) that excessive profits were realized in 1967. The profit increase is not explained by volume, which increased only from $1,965,000 to $2,204,658 in renegotiable sales, nor by any found change in the character of the business. The value added factor, in particular, appears common to both years.
The subsidiary used a factor of 2.2 in billing the parent in the first six months of 1966, causing the parent to report a profit rate of only 2.8% of sales while D. C. Products realized 28.9%. Allegedly, this billing rate was decided on in good faith, but the accountant reduced it to 1.3 in the last half of 1966 to balance it out over the subsidiary’s fiscal year. This generated a nominal profit of but $1,371 for the subsidiary, .4% for that 6 month period. It had the *651 practical effect, as found, of deferring for 6 months most of the group’s 1966 income taxes, but had no effect on the 1966 renegotiation in which, by consolidation, inter-company billings were eliminated.
Plaintiff claims that the 1967 renegotiation is badly distorted, and demands a cost revision of $78,714 upward for the parent now in renegotiation, to reflect a proper billing rate for the last 6 months of 1966. The trial judge points out that this improper billing may have obtained the subsidiary its clearance by the Board, which is now final. He rejects the adjustment as wanting in equity, and we agree. But the fact remains that this inter-company billing corrupts the parent’s separate renegotiation data beyond correction. The conclusion is reemphasized that consolidated figures eliminating inter-company billing are the only ones furnishing a dependable basis for further deliberation, even though they must be abandoned in the conclusion and the result stated in the ultimate determination with reference to the parent’s sales and costs.
Defendant’s expert, Dean Kaitz, referred to and relied in part on the increase above-mentioned in the consolidated 1967 profit over 1966, but he used, erroneously in our opinion, the Internal Revenue Service Standard Industrial Classification (SIC) composite figures under Codes 3662 and 3830 as his "starting point” for determining the parent’s reasonable profit level on its manufacturing operations, excluding purchase from the subsidiary and R&D contracts. Code 3662 covers "Mfg. Electrical Machinery, equipment & supplies; Electronic components and accessories.” This was the group plaintiff said it belonged to on its tax returns. A composite ratio of profit to sales of companies that showed a profit, in plaintiffs size group, showed a figure of 10.25%. Code 3830 is "Mfg. Scientific instruments, photographic equipment, watches and clocks, Optical, medical, ophthalmic goods.” Its composite ratio was 10.4%.
Since the trial of this case we have indicated in Instrument Systems Corp. v. United States, 212 Ct. Cl. 99, 546 F.2d 357 (1976), and Major Coat Co., Inc. v. United States, 211 Ct. Cl. 1, 543 F.2d 97 (1976), our low opinion of this kind of evidence. At the time of trial of the instant *652 case, February 1975, defendant was following its unfortunate tangent of eschewing evidence as to specific compara-bles and proffering these composites, than which no guidelines can be more superficial. There is, of course, nothing in defendant’s exhibits 61 and 62 or elsewhere in the record to show how the composite company would compare to the company under review in such significant variables as value added, or the treatment of customer furnished material (Cf. Major Coat Co., supra, and Blue Bell, Inc. v. United States, 213 Ct. Cl. 442, 556 F.2d 1118 (1977).) There is nothing to show that any company making up the composites manufactured products of its own invention, a circumstance that cannot be without its effect on the profit it might reasonably expect.
While nothing was really needed to discredit this evidence, plaintiff, in an act of overkill, introduced its Exhibit 38, a tabulation of contemporary determinations of the Renegotiation Board concerning SIC Code 3662 companies. It reflects that the Board allowed, after renegotiation, retained profits of 13.3% (the lowest) to 17% (the highest) in refund cases, while its clearance determinations ranged from 14.2% to 20.3%. As a rebuttal of any inference that might be drawn from the SIC composites, this is on target, but we think the trial judge misused it as affirmative support for the determination he proposed to make. In Blue Bell, Inc., supra,id at 450, 556 F.2d at 1124, we indicated our belief that use of such evidence in that manner is improper. This is of course not to say that evidence about other Board decisions is unhelpful when the cases are shown to be similar and the rationale of the decisions is known. Cf. Major Coat Co., supra.
The trial judge says he is employing the Board’s expertise, citing the dissent in Mason & Hanger-Silas Mason Co. v. United States, 207 Ct. Cl. 106, 149, 518 F.2d 1341, 1366-67 (1975). The dissent in question urged the use of Board members and staff, as witnesses, who of course could be examined and cross-examined about the reasons for their opinions. The' mere list of SIC Code 3662 companies with a ratio of allowed profit to sales set opposite each name tells us nothing about the reasons, or which of all those named, if any, were similar in their *653 operations to the plaintiff, and, therefore, makes no use of the Board’s expertise. Reliance on such evidence does not produce an informed and reasoned determination. The trial judge compounds his error by seizing on the highest clearance, at 20.3%, as of special significance. That case represented an application, presumably (though we don’t really know), of all the statutory factors, while the trial judge introduces it into his structure as to the factor of "reasonableness of costs and profits” alone, while the other factors, that usually warrant favorable consideration, remained to be taken up. Thus, as defendant says, he applied the same factors twice.
Dean Kaitz, the sole expert witness on either side, has the qualifications of a financial analyst, which are not to be scorned in renegotiation, but he has not hitherto participated in Board level renegotiation, nor in any other capacity in the award and administration of defense contracts. Accordingly, he presented an analysis keyed to the statutory factor "reasonableness of costs and profits” alone, having its "starting point,” as stated in the SIC composites, and leaving it to the trier of facts, unaided by him, to apply the other factors, except the "capital and net worth” factor. He conceded that this was neutral, contrary to the Board, which found the returns on capital and net worth to be "high and indicative of excessive profits.” This concession would support a refund lower than the Board required, assuming its entire expertise in its analysis of the other factors, and defendant’s counsel displayed his awareness of this by urging a determination lower than the Board’s $125,000, asking, in fact, for only $101,151 unless we sustain his point, discussed, infra, on the prima facie case. Thus, although Dean Kaitz’s determination based on "reasonableness of costs and profits” alone exceeded the Board’s, it cannot be said that defendant has even offered evidence or urged that the court should determine a refund as high as the Board did, on application of all the factors.
Dean Kaitz made the assumption that plaintiff was
[N]o different in substance and/or efficiency or effectiveness- than most other companies within the manufacturing area. Tr. 325.
*654 He knew about the plaintiff, he explained, from the papers and from the evidence previously presented, i.e., plaintiffs prima facie case, but it does not appear he knew anything about the other companies except their presence on the SIC Code 3662, which Code and 3830 were apparently the "manufacturing area.” There is a curious passage where Dean Kaitz was asked if he had any opinion as to plaintiffs "managerial complexity.” As this seemed to go outside his previously claimed expertise, plaintiff examined him on voir dire. He claimed he knew of 10 or 12 companies similar to Dynasciences, but was unable to name them, and ultimately said he preferred not to answer the question. Tr. 369-371.
As to the material purchased from the subsidiary, Dean Kaitz allowed a profit of 6% in the nature of a fee for management, and for testing and calibrating. We question whether this allows sufficiently for the fact that plaintiff had designed the articles it bought from D. C. Products and also found the buyers for them, but perhaps, if he had considered the other factors, he would have conceded they warranted an upward adjustment here. If one considers the consolidated data, one removes the distinction between the products plaintiff ostensibly manufactured itself and those it ostensibly manufactured by its subsidiary.
Dean Kaitz allowed 8% on the R&D work, a figure he averaged from those negotiated in the R&D contracts. The trial judge upped this to 10%, on "reasonableness of costs and profits” alone. We have held that a negotiated profit rate is not controlling in renegotiation, either for or against the contractor. Gibraltar Mfg. Co. v. United States, 212 Ct. Cl. 226, 546 F.2d 386 (1976). But it may be suggestive. There is really no evidence in this case as to what profit on this R&D work would be reasonable, there being offered not even any SIC composites. Unaided reason suggests that any predetermined rate of profit would be unfair, in a class of contract when so much depends on the value of the results and the skill and resourcefulness with which they are pursued, rather than on the mere lump expenditure of materials and manpower. Most of the R&D contracts were cost-plus-fixed-fee (CPFF), so the ratio of profit to sale would be apparently enhanced by the *655 contractor’s success in controlling costs, though such success should be a favorable factor.
Defendant made an effort, as the trial judge says, to show that plaintiff delivered defective work. The foundation for this was a number of performance reports furnished by the procuring agencies to the Renegotiation Board. Plaintiff urged us to hold that these reports were inadmissible. We have already held to the contrary in Butkin Precision Mfg. Corp., supra, but it is suggested, without foundation in fact, that the matter was not then carefully considered. It is urged that the reports were hearsay under the new Federal Rules of Evidence, Pub.L. 93-595, 88 Stat. 1926. Rule 802. We reiterate that they are admissible as public records or reports by Federal officials on matters that come under their observation in course of performing their official duties. Rule 803(8). The Renegotiation Board has them and it would be a most unfortunate construction of the Rules of Evidence to require us to second guess the Board, while kept in ignorance of much that the Board knows. Plaintiff we think overlooks that statutory renegotiation is itself a regular official duty of the executive branch, and performance reports have always been necessary aids towards the accomplishment of that duty. They are not prepared in anticipation of litigation since the object aimed for in renegotiation and usually attained, is a bilateral agreement and not a lawsuit. Cf. Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1 (1974). In view of the trial judge’s conclusions as to the quality of plaintiffs performance, it could be said that any error in admitting and considering these reports was harmless; however, they might have influenced him in not clearing the plaintiff as it urged that he do. We prefer to rest our decision on our interpretation of the Rules.
Plaintiff sought to capitalize R&D expenses incurred in 1965, allocating $18,500 to the year under review and reducing profits by that amount. The trial judge disallowed this for reasons we accept. This was for the Dynalens. The electrostatic discharger, which accounted for most of plaintiff’s sales in the year under review, over one-third of them, was developed by plaintiff in 1962 and no amortization of its development cost is in issue. Parties who invent *656 advances over prior art (as both the Dynalens and the electrostatic discharger were) and who manufacture their own inventions, naturally expect to sell at prices that will reward the invention as well as the manufacture. This is as true of competitive times as it is of war and emergency times. The plaintiff clearly entertained this expectation. As we pointed out above, there is nothing to show that any of the companies entering into the SIC composites had any reason to have similar expectations; if there were, if would likely be those at the high of the range of ratios of profits to sales and not those at the median, whose profits were used for comparison here. These matters are for favorable consideration in renegotiation under the factors of efficiency and contribution. If no prior years’ R&D expenses in developing the products sold are claimed or allowed to be amortized as part of the costs in the year under review, this is clearly a matter to enhance the favorable factor allowances. We find no consideration of this in Dean Kaitz’s testimony, and indeed his own concept of the scope of his qualifications barred him from entering on this line of thought. The trial judge would appear to have considered it in his otherwise unsupported leap from 10% to 20% for allowable profit on manufactured products and his further reduction of his excessive profits determination from $134,020 to $67,000 on the basis of factors other than "reasonableness of cost and profits” and "net worth.”
In any event, we could not eliminate the various allowances the trial judge made without doing violence to our perception of the purposes for which factor consideration was required by the Congress. The somewhat nominal determination of $67,000 reflects our perception on application of all the factors that excessive profits of at least that amount were realized. With a more refined analysis, some larger figure might be shown to be excessive, but defendant, who had the burden of proof, has not given us the materials necessary for fine analysis.
Defendant, however, further says that plaintiff failed to make a prima facie case. Without expert testimony and without valid comparisons with other contractors, it was not so very different from the cases made in, e.g., Butkin, supra, and Gibraltar, supra. Defendant did not move to *657 dismiss at the close of plaintiffs case, as we think it should have done if plaintiff was not to get the benefit, in making its prima facie case of whatever defendant added to the record in its effort to carry its burden of proof. We reject the contention now.
There follows as Chart A three columns summarizing the Board determination, the tentative redetermination of this court, on a consolidated basis, and its ultimate redeter-mination on an unconsolidated basis. The second column is not part of the decision, but merely a mental aid in reaching it.
CHART A
DYNASCIENCES CORPORATION
Renegotiation year ending June 30, 1967 Summaries
Per Renegotiation Per Court Per Court

Board Unconsolidated Consolidated Unconsolidated

Reneg. Sales .... $2,210,658 $2,204,658 $2,204,658
Reneg. Profit .... 360,383 455,047 354,383'
Percent . 16.3% 20.6% 16.1%
Profit to be
Eliminated .... 125,000 67,000 67,000
Adj. Sales . 2,085,658 2,137,658 2,137,658
Adj. Profit . 235,383 388,047 287,383
Percent . 11.3% ' 18.15% 13.4%
In the consolidated figures, inter-company transactions are eliminated. In the unconsolidated figures, of course, they are not.
CONCLUSION
In summary, thé court does not adopt, though it prints to illustrate its own views, the portion of the trial judge’s opinion captioned Conclusion on the Factor of Reasonableness of Profit, Alone. It does not adopt findings 64(cMe), 65(c) and (d), 66(c) and (d), and all of 67.
Upon the above per curiam opinion of the court, and the trial judge’s remaining opinion and his remaining findings *658 which have been furnished to the parties, and, are adopted by the court except as stated, but not printed, the court concludes as a matter of law that plaintiff realized excessive profits in the gross amount of $67,000 under contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended. Neither party has shown to the court’s satisfaction that the trial judge’s determination of the amount of excessive profits should be either raised or diminished. It is ordered that judgment be and the same is entered for the United States, on its counterclaim in said sum of sixty-seven thousand dollars ($67,000), less adjustment for state taxes measured by income and the applicable Federal tax credit, if any. The case is remanded to the Trial Division for further proceedings in the event the parties are unable to agree as to the appropriate adjustments and credits and interest on the net amount to be repaid.
The trial judge’s opinion follows:
Schwartz, Trial Judge:
This proceeding is brought to determine whether the renegotiable profits earned in 1967 by plaintiff Dynasciences Corporation were excessive within the meaning of the Renegotiation Act of 1951, and if so, to what extent. 50 U.S.C. App. § 1211 et seq. On the de novo trial required by the Act, 50 U.S.C. App. § 1218 (Supp. V, 1975), profits are here determined to have been excessive in the amount of $67,000 and judgment for that sum is awarded the United States. Detailed findings of fact have been filed, and this opinion will summarize, in terms of the factors specified in Section 103(e) of the Act, the facts governing excessiveness. 50 U.S.C. App. § 1213(e)(1970); see Mason & Hanger-Silas Mason Co., Inc. v. United States, 207 Ct. Cl. 106, 113-118, 518 F.2d 1341, 1345-49(1975).
Plaintiff’s Origins. Dynasciences Corporation is a small research-and-development oriented company which grew to maturity in the Vietnam War.
Incorporated in 1962 by three technologically minded men, plaintiff remained a small, almost entirely R&D company until 1965, with no more than $700,000 in sales annually. In its fiscal year ending in June 1966, the year before the year under review, production for the Vietnam War caused a relatively great increase in non-R&D *659 business. Sales increased threefold or more, with non-R&D sales accounting for $1.7 million. The increase in volume, coupled with the war-caused scarcity of available machine shop capacity, led plaintiff to increase its in-house manufacturing capacity, and in January 1966 it split-off the manufacturing part of its business, incorporating it as a wholly-owned subsidiary called D.C. Products, Inc.
Contracts with the military, all renegotiable, accounted for some 97 percent of plaintiffs sales in the review year, as well as in the earlier years. Non-renegotiable sales are here disregarded as minimal.
Plaintiffs book sales, profits and profit rate in its fiscal year 1967 were: sales, $2,210,658; profits $360,383; and thus a profit rate of 16.3 percent. The subsidiary in the same period (not its fiscal year) made $916,123 in renegotiable sales on which the profit was $94,664, a profit rate of 10.3 percent. These profits of $94,664 of the subsidiary were, of course, earned on the goods sold to plaintiff and by plaintiff resold to the Government, with other services, at a profit of $360,383. The same goods, twice sold, thus helped gain for the parent and its wholly-owned subsidiary a total profit of $455,047, representing a profit rate of 20.6 percent on the (parent’s) renegotiable sales to the Government of $2,210,658.
The parent, plaintiff here, filed a return with the Renegotiation Board for its fiscal year 1967 showing the mentioned sales of $2,210,658, profits of $360,383, and profit rate of 16.3 percent. The Board made a unilateral decision that plaintiffs profits were excessive in the amount of $125,000. This suit followed.
Nature of the Business. The parent and subsidiary, together, had capability for R&D work and associated production in the fields of aerodynamics, static electricity, optical research and printed circuit work. Their joint total staff was 130, with emphasis on engineers; many of these had bachelor’s degrees and some had advanced degrees. The staff worked hard though salaries were not high.
While the two companies had separate payrolls and kept separate books, they shared officers and worked as a more or less undivided unit, occupying a small plant in Blue Bell, Pennsylvania whose movable partitions accommodated the *660 work of both as necessary. The plant was furnished frugally with secondhand machines and office furniture. Operations were economical throughout.
In matters of bidding, performance and review and audit, the two were treated by the Government as one unit. When plaintiff received an award of a contract from the Government it would subcontract to the subsidiary the manufacture of any product or device called for by the description of contract work. The subsidiary provided the materials for manufacture and plaintiff provided materials' and tools for testing, calibrating and finishing the product purchased from the subsidiary and resold to the Government. The fabricated products of the subsidiary were neither physically transferred, when ready for plaintiff, nor were documents exchanged between the two.
Plaintiff is entitled to favorable consideration for the economical, no-nonsense manner in which it did its work. Regulations, Renegotiation Board, 32 C.F.R. § 1460.9(b)(1974).
Types of Contracts. In the review year, research and development contracts accounted for 26 percent or approximately $575,000 of plaintiffs book sales of $2,210,658 and fabricated products accounted for 74 percent or $1,635,000. About 80 percent of the R&D contracts or 21.6 percent of sales, were cost-type, either cost-plus-fixed-fee (CPFF) or cost-plus-incentive-fee (CPIF). All or substantially all of the fabricated products contracts or 74 percent of total sales and a small part of the R&D sales (about 4.5 percent of total sales) were fixed-price contracts.'
Some of the R&D work called for a tangible product such as a prototype and some for a study described in a report or embodied in a handbook. Following performance of a study, the Government might award plaintiff a contract for the model or prototype described or designed in the study. Plaintiff would then subcontract production work to the subsidiary, which when it produced the model would turn it over to plaintiffs engineers for the finishing touches of testing and calibrating.
Production in the Review Year. One of plaintiffs two major products in the review year was a device called an electrostatic discharger which releases the static electricity *661 in a hovering helicopter. It was developed by plaintiff for use on Sikorsky helicopters made for the Navy. Sales in the review year were $700,000, about one-third of plaintiffs total.
The device neutralizes the static electricity generated in a helicopter by the rotation of the blades and ordinarily discharged when the machine grounds, with consequent risks of shock to ground crew who handle the underslung cargo. It works by ionizing the air with an opposite charge which draws the static electricity away from the craft, to be blown away by the rotor downwash.
Acceptance of the discharger has been an uneven affair. The rejection rate was in the early period high and remained somewhat high. There were quality control problems and performance problems. Maintenance was difficult and actual life was shorter than expected. At one time, the units in use in Vietnam were deactivated and design changes ordered. In 1971 an extensive improvement-of-product analysis showed remediable defects in the design. In 1973 the dischargers were again deactivated. As of 1975 some models were still being purchased by Sikorsky for use as standard equipment on some helicopter models. The discharger is presently again in process of improvement by the Navy.
Plaintiffs other major product was known as the Dynalens. This device, developed by plaintiff in 1962 for use with telescope, camera or binoculars, is an image-motion compensator designed to eliminate the blurring in an image caused by vibration. It does this by bending the rays of light entering a lens in order to compensate for the vibrations which may result from an unsteady platform. The result is a clear, stablized image. It is particularly useful in helicopters, because of the intense vibrations which occur in such aircraft.
The Dynalens has received awards for technical achievement and has been adapted for use on the television cameras of the Columbia Broadcasting System.
Plaintiff made $141,000 in sales of the Dynalens to the Air Force in the review year. Units have also been sold to the Marine Corps.
*662 A substantial part of plaintiffs R&D work was done for the Army’s Aberdeen Proving Ground, under a cost-type contract designed to give the Government quick responses to unusual problems.
One such assignment called for the design, construction and flight testing of a lift-boost system which would increase load capacity and lift capability of helicopters, to meet Vietnamese environment conditions which were forcing operation at less than load capacity.
Sales under this contract were $137,000. The renegotiable performance report said that plaintiff was "economical in use of materials, facilities and manpower”; that "methods of operation” were "excellent”; that plaintiff made "effective use of his facilities”; "provided a very fine cost breakout” and that "pricing policies are reasonable”; that "it is obvious that the firm knows what they are doing and how to do it” and that the "concept of the lift boost system * * * was proved feasible during this contract effort” though development of larger helicopters made further development unnecessary; "performance very satisfactory.”
In another such assignment the plaintiff produced a landing net dispenser consisting of a wire net carried in folds below a helicopter, to be dropped on treetops, allowing a helicopter to land and deploy troops in a forest. Sales were $125,000.
The renegotiable performance report states that plaintiff was an "average producer,” with "pricing policies considered reasonable”; that deliveries were on-time except for a small quantity which was delivered 2 weeks late; that reliable cost information was furnished; that no new devices were developed during the progress of the contract and that performance was "satisfactory.”
The subjects of other R&D contracts were an airborne stabilized laser illuminator system; a specific turbulence generating system; a ducted fan/propeller propulsion system; the design and manufacture of an antifogging device for high speed photographic film; an automatic sand-bagger capable of filling and stapling 500 bags an hour; and a jet-propelled swamp boat capable of skimming over rice paddies and marshes and a site-marker for *663 downed pilots. Sales under these contracts ranged from $10,000 to $50,000 in the review year.
Some of the agencies involved in these contracts reported poor performance by plaintiff. Others reported fair or successful performance.
On trial the Government made determined and in my opinion unsuccessful efforts to show that plaintiffs products were defective. The total impression from the record is of a variety of difficult assignments, priced fairly and closely, performed with very substantial skill and application, sincerity and honesty, whose novel products predictably included a goodly number whose performance was less than what might have been desired. For this plaintiff is entitled to favorable consideration. Regulations, Renegotiation Board, 32 C.F.R. §§ 1460.8(a), 9(b)(1974).
Plaintiff is entitled, too, to favorable consideration in recognition of the increase in its volume, all devoted to war production, in 1966 and 1967 over its earlier years. Regulations, Renegotiation Board, 32 C.F.R. § 1460.10(b)(3)(1974).
Contribution to the Defense Effort, the Public Interest, and Fair and Equitable Dealing. The majority of plaintiffs products and studies in the review year were directed towards the development of unique and imaginative military items. Moreover, plaintiff did all it could to further the defense effort, sending its technicians to the Sikorsky plant, to Vietnam and wherever else they were needed. Its work was certainly in the mainstream of the defense effort and while it may have produced no major or startling inventions, the patent and substantial value of its work for the military calls for favorable consideration for a substantial contribution to the defense effort. A.C. Ball Co. v. United States, 209 Ct. Cl. 223, 254, 531 F.2d 993, 1010 (1976); Boeing Co. v. Renegotiation Board, 37 T.C. 613, 643 (1962), app. dismissed, 325 F.2d 885 (9th Cir. 1963), cert. denied, 377 U.S. 923 (1964); Regulations, Renegotiation Board, 32 C.F.R. § 1460.13(b)(1974).
Net Worth. Plaintiffs net worth was very small relative to the amount of its profits. It had assets at the end of 1967 of approximately $1 million. The parties are rightly agreed that in view of the non-capital-intensive nature of the *664 business, net worth is not a relevant measure of the reasonableness of profits. A.C. Ball Co. v. United States, supra, 209 Ct. Cl. at 255, 531 F.2d at 1010-11 (1976). Plaintiff is not entitled to favorable consideration under this factor.
Risk. While plaintiffs R&D contracts presented little risk, the non-R&D contracts, largely fixed-price and accounting for 75 percent of plaintiffs sales presented the risks of all fixed-price contracts — rising costs — in a wartime period of scarcity. A.C.Ball Co. v. United States, supra, 209 Ct. Cl. at 248, 531 F.2d at 1007 (1976); B-E-C-K McLaughlin & Associates v. Renegotiation Board, 13 CCF ¶ 82,481 (1969), aff’d 443 F.2d 1180 (9th Cir.1971); 32 C.F.R. § 1460.12(b)(1)(1975). Further, plaintiffs pricing policy, it appears from the agency reports, was one of commendable close pricing. Section 103(e)(1), 50 U.S.C.App. § 1213(e); 32 C.F.R. § 1460.12(b)(2)(1974).
Reasonableness of Costs and Profits. 1. Claimed Adjustments to Profits. The first of two claimed and contested adjustments to plaintiffs book profits is an alleged billing error in the inter-company sales by the subsidiary to the plaintiff in the last 6 months of 1966 (the first half of plaintiffs fiscal 1967, the review year). The subsidiary used a billing factor of 1.3 and in that period had sales of $339,531 and profits of $1,371, a profit rate of 0.4 percent. On review, separately from plaintiff, by the Renegotiation Board for that half-year, the subsidiary was cleared by the Board.
Plaintiff now claims that this billing factor was an error, distorted its 1967 profits upward and should be rectified by allowing plaintiff to average its profits with those of the subsidiary, for the full year 1966, the latter 6 months of which would affect the first half of plaintiffs fiscal 1967.
The net effect of the claimed adjustment would be to increase the profits of the subsidiary for the last 6 months of calendar 1966 by $78,714 and increase plaintiffs costs by the same amount for the same period, thereby reducing plaintiffs profits in the review year by that amount; The subsidiary’s profits would be raised; the plaintiffs profits would be lowered.
*665 The adjustment is disallowed. The subsidiary was cleared by the Renegotiation Board, without refund, on its renegotiation return showing its modest profit for the 6-month period ending December 31, 1966. The intercom-pany billing rate once determined by plaintiff and having played an integral part in a fiscal relationship between the wholly-owned subsidiary and the Government, cannot be readjusted to suit the interests of the plaintiff in the renegotiation of its own profits. Cf. Aero Spacelines, Inc. v. United States, 208 Ct. Cl. 704, 720, 530 F.2d 324, 335(1976); Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 419-20 (1932); Higgins v. Smith, 308 U.S. 473, 476-78 (1940); Hess v. United States, 210 Ct. Cl. 483, 494-97, 537 F.2d 457, 463-64 (1976), cert. denied, 430 U.S. 931 (1977).
The second adjustment to profit sought by plaintiff has to do with research and development expenses of $53,147 incurred in 1965 and at the time expensed. Two years later, the writing off of the expenses was reversed and the costs were capitalized. This was done by the auditors in charge of the preparation of a securities registration statement and plaintiffs tax return for its fiscal year 1967 was filed on the basis of the capitalization. Thereafter plaintiffs regular accountants reversed the reversal, reinstating the expens-ing of the 1965 R&D costs, and plaintiff sought and was allowed an IRS adjustment and tax refund on the basis of that accounting action.
Plaintiff would now, for purposes of renegotiation of its 1967 profits, reverse the reversal of the reversal, again capitalize these expenses of $53,147, and amortize them over 1966 and 1967, thereby reducing plaintiffs profits in 1967, the review year, by the amount of $18,500.
This adjustment, too, is disallowed. Under the authorities cited above, transactions once recorded on a claimant’s books in a reasonable and appropriate manner, beneficial to the claimant, cannot be reversed, at least without more evidence than is here apparent, so as to create a second benefit whenever it suits the claimant’s interests.
A third adjustment to book sales and profits is agreed to and is allowed. It involves a $6,000 refund made by plaintiff under the Truth in Negotiations Act, 76 Stat. 528 *666 (1962). The parties are agreed that the $6,000 involved should be deducted from plaintiffs book sales and profits and thus for purposes of renegotiation 1967 sales are $2,204,658; profits $354,383, and the profit rate is 16.1 percent.
2. Pre-review-year profits. Plaintiff was, as already noted, a much smaller company in its earlier years. Sales in 1963-65 ranged from $112,000 to $503,000, with profit rates of 2.6 to 3.4 percent. The profits of those years provide little basis for passing judgment on the reasonableness of the profits in the review year.
Sales and profits in 1966, when plaintiff filed a return consolidated with its subsidiary, were sales $1,956,062 and profits $243,974, a profit rate of 12.5 percent. In view of the tripartite nature of plaintiffs work in the review year, described below, there is insufficient evidence of a similarity between its business in 1966 and 1967 to make 1966 a base year for a rigorous measure of plaintiffs 1967 profits. Compare Mason & Hanger-Silas Mason Co., Inc. v. United States, supra, 207 Ct. Cl. at 139, 518 F.2d at 1360 (1975).
3. Profits of Other Companies. There is no "industry” corresponding closely to plaintiffs business. The closest comparisons to be found are the electrical machinery, equipment and supplies industry and the scientific and optical instruments and photographic equipment industries. According to the Internal Revenue Service’s Standard Industrial Classifications, companies in these industries in the same total asset size as the plaintiff reported average profit rates of 10.25 and 10.4 percent respectively. Plaintiff was however much more than a conventional manufacturer of electrical machinery, scientific instruments, photographic equipment or optical goods. It developed the scientific optical and photographic equipment it sold. Its involvement in electrical machinery, equipment and components came about through R&D work and not manufacture or fabrication of standardized goods.
The Renegotiation Board has required refunds from companies in these same IRS classifications as left reasonable profits ranging from 13.3 percent to 17 percent. These determinations were unilateral and were made after consideration of all the statutory factors. In cases of *667 clearances granted without refund, the Board left undisturbed profits ranging from 14.2 percent to as high as 20.3 percent. The averages were profits of 14.86 percent for the refund cases and 15.79 percent for the cases in which clearances were granted without refund.
4. Plaintiffs R&D Profit Objectives. In plaintiffs larger R&D contracts — fixed-price and cost-type — it calculated profit rates ranging from 6.5 percent to 9.1 percent of sales. Contractors who did R&D work for one of plaintiffs customers, the U.S. Army Materiel Laboratory at Fort Eustis, Virginia, made profits of from 6 to 8.5 percent on cost-reimbursable contracts and from 6 to 14 percent on all contracts. Profits on plaintiffs contracts with the Fort Eustis Laboratory, accounting in the review year for 5 percent of its sales, ranged between 6 percent and 8 percent.
5. Expert Opinion on Reasonable Profits. The Government presented the testimony of a witness, highly qualified as an expert in finance, management and accounting, Dr. Edward M. Kaitz. Dr. Kaitz is Dean of the School of Business Administration of Georgetown University and was for some years a senior associate with Arthur D. Little & Associates. He has served on Presidential commissions in the field of management.
Dr. Kaitz testified that plaintiffs activities should be divided into three parts for purposes of inquiry into an appropriate and reasonable profit. This division is reasonable and is adopted.
Dr. Kaitz’ divided plaintiffs work into three parts, and proposed profits for each part, as follows:
(1) - "management services,” consisting of the area of work subcontracted to the subsidiary. Plaintiffs costs for this work were $916,123, the dollar sales by the subsidiary to plaintiff.
On this work, Dr. Kaitz testified, a 6 percent override for profit would be fair and reasonable.
(2) - R&D sales, 26 percent of the total adjusted sales of $2,204,658, were $573,211.
On this part of the work, Dr. Kaitz testified, a profit of 8 percent would be fair and reasonable.
*668 (3) On plaintiffs remaining sales in the review year, estimated to be $522,828 and consisting of the finishing, calibrating and testing of the products of the subsidiary and other work not strictly R&D, Dr. Kaitz testified, a 10 percent profit would be fair and reasonable.
The plaintiff introduced no expert testimony.
Conclusion on the Factor of Reasonableness of Profit, Alone. The rates of profit here found to be reasonable, on the factor of reasonableness of profits alone and without regard to the other statutory factors (to be weighed below) are as follows:
1. There is adopted Dr. Kaitz’ 6 percent opinion on plaintiffs "management services,” whose costs (the billings of the subsidiary to the plaintiff) were $916,123. The decision is largely influenced by the fact that the allowed profit should in equity be consolidated with the $94,664 which the subsidiary made as profit on these same sales. A 6 percent profit on costs of $916,123 would give plaintiff a profit of $58,476 ($916,123=94%; $58,476=6%; $974,599=100%) which combined with the subsidiary’s profit of $94,664 gives a total profit of $153,140 on the sales of $974,599 by the parent to the Government, a resulting profit rate of 15.7 percent, surely ample.
2. Dr. Kaitz’ opinion that an 8 percent profit is fair and reasonable on plaintiffs R&D work seems too low. Plaintiff sought and received profits ranging as high as 9 percent. Some of its larger profits (its 16.3 overall rate of profit presumably reflects larger than 9 percent profit on its R&D work) in all likelihood are refactions of the savings and economies practiced by plaintiff. To avoid depriving plaintiff of a fair profit, it is concluded that a reasonable rate on plaintiffs R&D sales of $573,211 R&D contracts is 10 percent.
3. Dr. Kaitz’ opinion on the reasonableness of a 10 percent profit on the remainder of plaintiffs production is also deemed to be too low. The evidence is that manufacturing companies in areas close to plaintiffs work averaged 10 percent; that the Renegotiation Board allowed 15 and 16 percent and left undisturbed profits as high as 20 percent. The use of- the Board’s judgment for this purpose is warranted as a seeking out of expertise wherever it may *669 be, and is no prejudice to the de novo character of these proceedings. Compare the dissenting opinion of Nichols, J., in Mason & Hanger-Silas Mason Co. v. United States, supra, 207 Ct. Cl. at 149, 518 F.2d at 1366-67 (1975). Compare, also, 32 C.F.R. § 1459.1(b)(5)(1975) which provides that the decisions of the Commissioner of Internal Revenue, which are not binding on the Renegotiation Board, will be considered by the Board.
Plaintiff is entitled to no less than the maximum so allowed in compensation of the inventiveness and innovation characterizing its activities and in consideration of the fact that it is the Government which has the burden. A.C. Ball Co. v. United States, supra, 209 Ct. Cl. at 264, 531 F.2d at 1016 (1976); Aero Spacelines, Inc. v. United States, supra, 208 Ct. Cl. at 712, 530 F.2d at 330 (1976). It is, therefore, concluded that a 20 percent profit on this third branch of plaintiffs work would be fair and reasonable.
The foregoing conclusions may be tabulated as follows:
*670 Profit Rate
Sales Found Fair Cost Profits
1. Total (adjusted) sales, $2,204,658 costs and actual profits $1,850,275 $354,383 (actual)
2. Worksubcontractedto 974,599 6% the subsidiary (computed from other columns) 916,123 58,476 (actual) (reasonable)
3. R&D Sales 573,211 10% 515,890 57,321 (computed (reasonable) from other columns)
4. Remaining Work 522,828 20% 418,262 104,566 (reasonable)
Total sales, costs & non- 2,070,638 excessive profits prior to application of statutory factors 1,850,275 220,363 (reasonable)
Total excessive profits 134,020 prior to application of statutory factors 134,020 (excessive)
$2,204,658 $354,383
(actual) (actual)
The elements of the tabulation may be explained as follows:
Line 1. Sales, Cost and Profits, contains book amounts, as adjusted herein.
Line 2, Work subcontracted to the subsidiary. In this line, the known factor is $916,123 in costs to plaintiff of plaintiffs subcontracts to its subsidiary. On the allowance of a 6 percent profit, the costs of $916,123 become 94 percent, total sales become $974,599 and profit at 6 percent becomes $58,476 (94 percent of $974,599 is $916,123; 6 percent of $974,599 is $58,476).
Line 3, R&D Sales, comprising 26 percent of revenues, are known to amount to $573,211. This sum is 100 percent *671 of which 10 percent is allowed as profit. Costs, 90 percent, are thus $515,890 (90% of $573,211 is $515,890; 10% is $57,321).
Line 4, Remaining Work, derives $418,262 as the remaining costs of plaintiffs work by deducting the costs of the above two parts of plaintiffs work — $916,123 and $515,890, whose total is $1,432,013 — from total actual costs of $1,850,275.
On the allowance of 20 percent profit on these costs of $418,262, the costs are 80 percent of sales and thus 100 percent of sales becomes $522,828, costs at 80 percent become $418,262 and profits at 20 percent of sales become $104,566.
Line 5, shows a reasonable profit, on the factor of reasonableness of profits, alone, of $220,363, and
Line 6,thus shows excessive profits of $134,020. Under the factor, therefore, alone, of the reasonableness of profits, plaintiffs profits in 1967 of $354,383 were excessive in the amount of $134,020.
Conclusion on the Basis of All the Statutory Factors. In my opinion plaintiff is entitled to essentially unqualified favorable consideration under the factors of the nature of its business, efficiency, volume and increase in volume for war production, risk, reasonableness of costs and pricing and contribution to the defense effort. The factor of net worth is neutral, neither adding nor detracting from the overall judgment as to reasonableness. Section 103(e), Renegotiation Act, 50 U.S.C.App. § 1213(e)(1970).
The purpose of the Renegotiation Act is to recapture excessive profits and yet to encourage the fullest production and the greatest effort in the defense of the United States. The latter purpose here warrants special concern. The nation has good reason to be grateful to plaintiff, a small business, for the earnest, economical, industrious, innovative and largely successful work it did to assist and advance the war effort. Notwithstanding, plaintiffs excessive profits must be shared with the Government, for their entire source was the war. Mason & Hanger-Silas Mason Co., Inc. v. United States, supra, 207 Ct. Cl. at 140-43, 146-47, 518 F.2d at 1361-63, 1364-65(1975).
*672 It is difficult to formulate a precise judgment on how much of the otherwise excessive profits plaintiff should be entitled to keep in consideration of these policies as reinforced by the record. For "lack of any better way,” the difficulty of judging will be resolved by a division in half of the amount involved. One half will serve as the reward and compensation for voluminous and creditable production in aid of the defense effort, and the other half will go to the Government as its share of profits whose volume increased by reason of the war, thereby serving both the policy of preventing profiteering from war and rewarding production for defense. A.C. Ball Co. v. United States, supra, 209 Ct. Cl. at 229, 262, 531 F.2d at 996, 1015; cf. National Presto Industries, Inc. v. United States, 167 Ct. Cl. 749, 769-70, 338 F.2d 99, 112 (1964), cert. denied, 380 U.S. 962 (1965).
It is for the foregoing reasons held that plaintiffs profits in 1967 from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951 were excessive in the amount of $67,000. Judgment for the United States in this amount less appropriate tax credits plus appropriate interest thereon should be entered on the Government’s counterclaim.